Carol D. HEERS, Harold W. Heers, and Charles M. Heers, trading as Heers Associates, a California Partnership

v.

The UNITED STATES.

No. 262-61.

United States Court of Claims.

March 13, 1964.

Joel C. Wise, Washington, D. C., for plaintiffs. Roger Peed, Washington, D. C., was on the brief.

Frances L. Nunn, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, Washington, D. C., for defendant. Allan B. Blumberg., Rockville, Md., was on the brief.

Before JONES, Chief Judge, and WHITAKER, LARAMORE, DURFEE and DAVIS, Judges.

## PER CURIAM:

This case was referred pursuant to Rule 37(e) to W. Ney Evans, a trial commissioner of this court, with directions to make his recommendation for conclusions of law on plaintiff's and defendant's motions for summary judgment. The commissioner has done so in an opinion filed September 27, 1963, wherein he recommended that plaintiff is not entitled as a matter of law to recover, that defendant's motion for summary judgment be granted, that plaintiff's motion for summary judgment be denied and that plaintiff's petition be dismissed. The case was argued and submitted upon the granting by the court of motions of the parties that the case be set for oral argument, without the filing of further briefs. Since the court is in agreement with the opinion and recommendation of the trial commissioner, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Plaintiff is therefore not entitled to recover. Defendant's motion for summary judgment is granted, plaintiff's motion for summary judgment is denied, and plaintiff's petition is dismissed.

## OPINION OF COMMISSIONER

### I

In an effort (which proved unsuccessful, as hereinafter recounted) to close a Capehart housing contract with defendant, plaintiff[1] paid over to defendant a bid deposit of $25,000 and an application fee of $17,000, both of which the defend-

---

1. Since plaintiff was a partnership, references to it are in the singular.

ant retained. Plaintiff seeks by this action to recover the $42,000 so paid.[2]

By way of " * * * explanation of the Capehart Act,[3] under which the controversy arises, * * * [as being] helpful in understanding the background events leading to the present suit," there is set forth in the next succeeding four paragraphs the summary contained in the opinion by Trial Commissioner Maletz (adopted per curiam) in Anthony P. Miller, Inc. v. United States.[4]

" * * * In essence, that Act is designed to provide housing for armed services personnel without the use of appropriated funds. To accomplish this objective, the Act provides for construction of housing projects on Government-owned property, pursuant to competitive bidding by private builders using private mortgage financing insured by the Federal Housing Administration (FHA) and guaranteed by the Military Departments. When the project is completed, the Department is responsible for amortizing the mortgage debt, including the payment of interest thereon, by the use of annual military appropriations for quarters allowances of service personnel. The Department is also responsible for maintenance and operation of the project after completion.

"The procedure for carrying out the statutory design is as follows: The Department issues invitations to bid. When bids are received, the Department, after consultation with the FHA, determines who has submitted the lowest acceptable proposal and issues to that bidder (who is referred to as the 'eligible builder'), a 'Letter of Acceptability.' This Letter requires the eligible builder to take four actions: First, he must organize a Delaware corporation which is referred to as the 'mortgagor-builder'; second, he must make arrangements with an acceptable mortgage lender for financing the total cost of the project, including profit; third, he must cause the mortgage lender to obtain an FHA commitment for insurance; fourth, he must execute a three-party Housing Contract which defines the rights and obligations of the Department, the eligible builder, and the mortgagor-builder. The Letter of Acceptability also requires the Department to execute a lease of a project-site to the mortgagor-builder.

"Once the foregoing arrangements are made, the parties in interest effect a 'closing' at which the mortgagor-builder delivers to the mortgagee a note, together with a mortgage securing the same, which bears a prescribed rate of interest. The eligible builder deposits in escrow with the mortgagee the capital stock of the newly formed mortgagor-builder corporation for ultimate delivery to the Department, and delivers to the Department certified checks covering the cost of design, supervision, administration, and inspection of the project.

"Thereafter, pursuant to the Housing Contract, the eligible builder causes the project to be constructed and is paid therefor entirely out of mortgage proceeds. All profits under the Housing Contract accrue to the eligible builder. As construction progresses individual housing units are placed under control of the Department. Determination as to completion of the project is made by the FHA which then issues a final endorsement of the mortgage note for mortgage insurance. When the project is completed, the capital stock of the mortgagor-builder is delivered to the Department by the mortgagee as escrow agent, and payment of the mortgage indebtedness of the mortgagor-builder is undertaken by the Department."

Against this background, the record before the court on defendant's motion and plaintiff's cross-motion for summary

---

2. An additional claim for $30,369.25, representing "cost incurred in travel, telephone, telegraph and overhead" (paragraphs 28 and 30 of the petition) has been withdrawn.

3. 42 U.S.C. §§ 1594–1594j (f); 12 U.S.C. §§ 1748–1748i.

4. No. 3–62, decided April 5, 1963.

judgment shows that the pertinent facts set forth below are undisputed.[5]

On March 13, 1959, the Department of the Army published an Invitation for Bids [6] for a Capehart Housing Project [7] of 864 units at Fort Shafter and Schofield Barracks, Oahu, Hawaii. A Wage Determination Schedule,[8] effective February 19, 1959, through May 21, 1959, was attached to the Invitation. This schedule was tentative only, since the Invitation for Bids contained the following provisions:

> * * * the bid price is subject to increase or decrease by an amount determined by the Federal Housing Commissioner (hereinafter called the "Commissioner") to represent the difference in the "Total Estimate of Replacement Cost of the Property or Project", computed according to the wage schedule attached to the Invitation for Bids and computed according to the wage schedule as amended by the "prevailing wage determination" as that term is defined in Paragraph (19) of the specimen form of Housing Contract attached to the Invitation for Bids. * * *.

* * * the bids called for by this Invitation for bids will include a provision for adjustment of the dollar amount therein specified to reflect any difference between the tentative minimum wage schedule attached hereto and the applicable minimum wage schedule as finally determined by the Secretary of Labor. Any such adjustment will be in an amount determined by the Commissioner to reflect such differences, and the amount of the lowest acceptable bid and the FHA estimated replacement cost of the property or project will be amended in the amount so determined by the Commissioner * * *.

The Invitation for Bids [9] required each bidder to submit a bid deposit of $25,000, and further provided:

> * * * In the event, the lowest acceptable bidder fails to effect a closing with FHA within the time prescribed, his deposit will be forfeited and become the property of the Department as liquidated damages unless the Department finds that he had made every effort to effect such closing and extends the time to effect such closing. * * *

---

5. Defendant's motion for summary judgment asserts that there is no genuine issue of material fact, and that as a matter of law, defendant is entitled to judgment dismissing the petition. Its memorandum in support of the motion contains a "Statement of Facts" (pp. 8–17).

Plaintiff's answer moves the court to dismiss defendant's motion in that there do exist genuine issues of fact to be determined by the court, which facts have not been admitted by defendant. In support of the answer, plaintiff (p. 2, par. 6) "admits the 'Statement of Facts' set forth in defendant's motion on pages 8 through 17 except * * *" for eight specifications.

Plaintiff's cross-motion for summary judgment asserts "that there exist no genuine issues of material fact, and as a matter of law, plaintiff is entitled to judgment."

At a conference with the trial commissioner on August 1, 1963, the attorneys

for the parties agreed that the issues raised by plaintiff in its eight exceptions to defendant's Statement of Facts relate primarily to conclusions of law to be drawn from the contract documents. By letter dated August 5, 1963, to the trial commissioner, the attorney for defendant has admitted the facts on which plaintiff relies in its exceptions (but not the conclusions drawn by plaintiff from the contract documents). These facts are not in conflict with assertions contained in defendant's Statement of Facts.

6. No. ENG–94–612–59–11.

7. This was Federal Housing Administration Project No. 140–81069–A–19.

8. Decision No. T–14,575, by the Department of Labor, pursuant to the Davis-Bacon Act, 40 U.S.C. § 276a (1958).

9. Paragraph 8.

On March 31, 1959, a pre-bid conference was held.[10] While no one representing plaintiff's firm attended, a copy of the minutes of the conference was furnished to plaintiff. The minutes contained the following:

d. This office will be particularly careful in evaluating any proposed delay in closing. Such delay will be permitted only if it can be clearly demonstrated that the delay is beyond the control of, and through no fault of, the bidder and his business associates. For example, delays due to difficulties in making financial arrangements will not be allowed since it can be assumed that a responsible bidder can make reasonably firm financial plans before submitting a bid.

On April 16, 1959, plaintiff submitted its bid to the Department of the Army, thereby assenting to the Invitation for Bids and the specimen Letter of Acceptability.[11] The bids were opened on the same day. Plaintiff was the lowest bidder, with a total bid of $11,332,820.[12]

On April 29, 1959, the contracting officer[13] sent plaintiff a Letter of Acceptability which ordered plaintiff to be ready for closing on or before June 28, 1959.[14]

On May 28, 1959, the Security First National Bank[15] submitted an Application for Mortgage Insurance, together with an application fee of $17,000, to the FHA. The Commitment for Insurance was issued by FHA on June 4, 1959, to the Bank as mortgagee, and called for payment of the commitment fee of $16,998.46 within 30 days.[16]

On June 9, 1959, plaintiff sent the Corps of Engineers a radiogram requesting a 60-day extension of the closing date because plaintiff had received "no offer of any price as of this date," but further advising that there were "indications" from two companies that some kind of financing would be available within 60 days.

On the same day (June 9, 1959), the Department of Labor issued a new wage determination,[17] which was to be effective through September 8, 1959.

On June 24, 1959, the contracting officer wrote to plaintiff as follows (in part):

Based upon the circumstances recited in your cablegram, an extension of thirty days in the time by which you are required to be ready for closing is considered warranted, rather than the sixty-day extension which you requested.

On July 2, 1959, the FHA Director in Honolulu granted the Bank an extension of 30 days within which to pay the commitment fee of $16,998.46. This extension contemplated payment on or before August 3, 1959.

10. At this conference the question of wages was discussed and prospective bidders were cautioned that their bids should include allowances "for subsequent increases in going wages."

11. With respect to adjustment of the bid price because of changes in rates in the "prevailing wage determination," the Letter of Acceptability provided (subparagraph 1n): "* * * Such wage determination will be used by the Commissioner to increase or decrease the bid price in the manner specified in your bid."

12. Since the FHA estimate of cost was $14,523,110, the contracting officer questioned the correctness of plaintiff's bid, but plaintiff assured him that the amount was correct, and that plaintiff would effect a prompt closing.

13. Representing the Army's Corps of Engineers, in Honolulu.

14. The Letter of Acceptability further obligated plaintiff to obtain financing, title insurance (if required by the mortgagee), commitment for insurance, and wage determinations upon which the FHA could make a contract adjustment.

15. Hereinafter, the Bank. The Bank was located in Riverside, California.

16. The total fee was $33,998.46, representing the sum of these two figures. The Bank paid $17,000 with the application. The remaining $16,998.46, described herein as the commitment fee, was never paid.

17. Decision No. T-24,649. This decision was issued to the Department of the Army.

On July 16, 1959, plaintiff's representative, meeting with the contracting officer, advised that its calculation of a contract adjustment was $391,631. Of this amount, $351,837 consisted of adjustments which were outside the scope of the formula specified in the contract. The basis of the request for these adjustments was that plaintiff would have to pay construction labor wages to workers it had previously thought to be classified as common laborers, and that other contractors were actually paying higher wages than those listed in the minimum wage determination.

The Corps of Engineers' estimated adjustment at that time was in the amount of $43,686.

On July 20, 1959, plaintiff wrote to the contracting officer requesting an extension of 36 days for the closing date, because plaintiff was "still unable to secure a commitment for financing."

On July 27, 1959, the contracting officer extended the closing date to September 2, 1959.

The FHA Director in Honolulu likewise extended the time for the Bank's payment of the commitment fee of $16,998.46 to September 2, 1959, on the basis of the opinion of a mortgage broker that plaintiff could get financing "during the early part of the week of August 17th."

On August 4, 1959, the contracting officer, in order to avoid further delay, furnished plaintiff with a new list of anticipated minimum wage rates. On August 11, 1959, at a meeting with the contracting officer, plaintiff proposed a bid adjustment in the amount of $712,340. The Army's estimate was then in the amount of $206,208. At another meeting on August 21, 1959, plaintiff submitted a revised estimate of adjustment in the amount of $1,119,000, and insisted that it would not settle on the basis of the suggested rates furnished to plaintiff by the contracting officer on August 4.

On August 10, 1959, section 403 of the Housing Amendments of 1955 [18] was amended [19] to preclude the use of FHA mortgage proceeds to pay for title insurance, although it was further provided that the Government "may provide for the payment of reasonable costs necessary for obtaining title search and title insurance."

On August 21, 1959, another wage determination [20] was issued, incorporating the rate changes of August 15.

On August 26, 1959, plaintiff wrote to the contracting officer asking for another extension of the closing date to October 2, 1959.

On August 27, 1959, plaintiff again met with the contracting officer to discuss an adjustment based on the wage determination of August 21, which differed only in minor detail from the rates previously suggested by the Army. At this meeting, plaintiff requested adjustment in an amount approaching $800,000 on the ground that its financing costs would be more than it had anticipated and that it might also have to absorb the cost of title insurance.

On August 31, 1959, the FHA Director in Honolulu, acting pursuant to a written request from plaintiff, extended to October 2, 1959, the time within which the Bank could make payment of the commitment fee of $16,998.46. The Director's letter stated:

> No further extension of time can be permitted beyond date of October 2, 1959, as our Administrative Rules and Regulations provide that in no event may the time for payment of these fees be extended beyond the term of the commitment.[21]

On September 2, 1959, the contracting officer extended the closing date to October 2, 1959.

On September 9, 1959, the contracting officer suggested to plaintiff that if it was committed to a title insurance com-

---

18. 42 U.S.C. § 1594 (1958).

19. By section 415 of the Military Construction Act of 1959.

20. Decision No. V-3, 619.

21. The term of the commitment was 120 days, from June 4, 1959.

pany, or if title insurance was required by the mortgagee, plaintiff might absorb the cost of such title insurance, in view of its relatively small cost, in order to save time. Thereafter, plaintiff inquired whether the Government would guarantee title, to which the contracting officer replied on September 11 that if a mortgagee would finance the project with a guarantee of title issued by the Secretary of Defense, immediate steps would be taken by the Government to issue such a title guaranty.

On September 22, 1959, the Secretary of Labor issued another wage determination,[22] effective to December 22, 1959.

On September 30, 1959, at a conference with the Division Engineer, plaintiff requested a bid price adjustment in the amount of $1,136,000.

On October 1, 1959, plaintiff requested further extensions of the Commitment for Insurance and of the time for payment of the commitment fee. These requests were denied by the FHA Director in Honolulu, who wired plaintiff and the Bank that the only condition upon which further extensions would be granted was the immediate payment of the commitment fee. Neither plaintiff nor the Bank offered to pay the fee.

On the same day (October 1, 1959) plaintiff requested another extension of the closing date, to November 4, 1959, on the grounds that plaintiff had "secured a commitment for half of the financing" and that there were "only some details to be worked out" for the other half.

On October 2, 1959, the contracting officer granted plaintiff an extension of the closing date of 7 days, to October 9, 1959, and stated that no further extensions would be granted unless plaintiff presented "satisfactory evidence of ability to obtain financing * * *."

On this day (October 2, 1959), the Commitment for Insurance expired. The fee had not been paid within the 120-day limit.

On October 6, 1959, plaintiff requested a further extension of the closing date, to November 9, 1959, on the ground that it would be impossible for the FHA to be ready by October 9, and further asserting that plaintiff would have to pay more than the minimum wage to man the job, that financing costs had risen greatly, and that "it is impossible for us to close the job * * *" unless given an additional $1,136,000 over and above the bid price.

On October 9, 1959, the contracting officer granted an extension of the closing date to November 2, 1959.

On October 30, 1959, plaintiff requested another extension of 30 days for the closing date, indicating that it had just obtained a commitment for financing, but adding:

> Subject to obtaining satisfactory adjustment in contract price as provided in contract document we will be in position to close within thirty days.

This message was confirmed by letter, which stated (1) that plaintiff was "agreeable to close the project within 30 days provided we obtain an adjustment in the contract price that will adequately compensate us for the increase in labor rates that we will be required to pay"; and (2) that plaintiff would agree to pay the fee to reopen the required insurance commitment "if the contract price is satisfactorily adjusted."

On the same day (October 30, 1959), the contracting officer denied plaintiff's request for a further extension, stating (1) that "[a]uthority cannot be obtained to negotiate contract amount in excess of your original bid price plus wage adjustment based on Department of Labor published wage * * * determination" and (2) that plaintiff's bid deposit would be forfeited unless plaintiff would, among other things, furnish on or before November 2, 1959, "[a]ssurances that you will take all other required actions nec-

22. Decision U-5,674. On September 28, 1959, Modification No. One made changes in four classifications.

essary to effect closing with FHA at your bid price plus wage adjustment in amount to be determined based on wage rates published with invitation and latest published Department of Labor wage rates."

On November 2, 1959, plaintiff replied by radiogram, giving names of firms who had made commitments for financing and bonding, and adding that plaintiff would close only if given a "wage adjustment satisfactory to us * * *."

On November 4, 1959, the contracting officer denied the request for a further extension of time and notified plaintiff that it was defaulted for failure to prepare for the closing within the required time. His letter reviewed the history of the negotiations and concluded:

> In view of your prolonged refusal to agree to a wage adjustment based on the formula specified in the bidding documents, it is concluded that you are either unwilling or unable to effect an initial closing unless your bid price is increased to an amount which cannot be legally justified. It is therefore determined that no further extension of the Letter of Acceptability will be granted. Pursuant to paragraph 3 of the Letter of Acceptability, your failure to perform all obligations prior to the time prescribed for closing is just cause for cancelling all commitments undertaken with you in connection with the housing project and for the recovery under your bid security of liquidated damages in the sum of $25,000.

On November 5, 1959, the District Counsel of the Corps of Engineers informed plaintiff by telephone that the contracting officer's letter declaring plaintiff in default had been mailed. Plaintiff thereupon sent a radiogram to the contracting officer stating that it would close the project if "the wage adjustment amounts to a minimum of 837,-000 dollars and provided that you accept our change order request on the panels * * *." The contracting officer made

no reply. His letter of November 4, 1959, represented his final decision.

Reduced to capsule form, these facts show that plaintiff, as the low bidder on a Capehart housing project, was issued a Letter of Acceptability on April 29, 1959, which called for closing on or before June 28, 1959; that plaintiff made a bid deposit of $25,000, and caused to be paid an application fee for insurance commitment of $17,000 subject to agreement to pay an additional insurance commitment fee of $16,998.46; that plaintiff was granted three extensions of the due date of the insurance fee, amounting to 96 days, carrying over to October 2, 1959, when the FHA refused further extension of time; that plaintiff was granted five extensions of the closing date, amounting to 127 days, carrying over to November 2, 1959; that in addition to the wage determination attached to the Invitation for Bids the Secretary of Labor made three other wage determinations prior to November 2; that plaintiff negotiated with the District Engineer for an adjustment in the contract price, based on wage rates, in the course of which plaintiff demanded six different dollar figures, none of which was computed in accordance with the contract formula; that plaintiff encountered difficulty in arranging financing of the project, being unable to advise of firm commitments until November 2, 1959; that on that day plaintiff conditioned its offer to close upon obtaining a "wage adjustment satisfactory to us"; and that on November 4, the contracting officer defaulted plaintiff for its "failure to perform all obligations prior to the time prescribed for closing."

The contracting officer retained the bid deposit of $25,000 under the liquidated damages clause of the contract, and the FHA refused to return the $17,000 application fee for insurance commitment.

Plaintiff appealed the decision of the contracting officer to the Secretary of the Army. The appeal was docketed by the Armed Services Board of Contract

Appeals[23] as No. 6137. A formal hearing was held, and the appeal was denied (in an extensive opinion) on January 19, 1961.

The petition in this court was filed on July 7, 1961.

## II

Defendant's first point, in its Argument of the case (p. 18), is that the decision of the ASBCA is final.

The Letter of Acceptability contained the following provision:

3. Failure to perform all obligations prior to the time prescribed for closing will be just cause for cancelling all commitments undertaken with you in connection with the housing project and for the recovery under your bid security of liquidated damages in the sum of $25,000.00. The decision of the Contracting Officer shall be in writing and shall be final and conclusive unless within 30 days from the receipt thereof, you appeal in writing to the head of the Department or his duly authorized representative, and his decision shall, unless determined by a court of competent jurisdiction to have been fraudulent or capricious or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence, be final and conclusive. * * *

Plaintiff assented to this provision in its bid.

The pertinent paragraph of the final decision by the contracting officer has been set forth hereinabove. It contained the finding "that you are either unwilling or unable to effect an initial closing unless your bid price is increased to an amount which cannot be legally justified."

The decision of the ASBCA contained the following:

The contracting officer was correct in his findings to the effect that appellant was unable or unwilling to effect a closing in accordance with the terms of the contract documents. * * *

These findings by the contracting officer and by the ASBCA are findings of fact. Anthony P. Miller, Inc. v. United States, Ct.Cl. No. 3–62, decided April 5, 1963, p. 19 (and cases cited). The Board decision was therefore final "unless determined * * * to have been fraudulent or capricious or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence * * *."

Plaintiff's petition alleges[24] that "[t]he decision of the Board contained many errors, was arbitrary, capricious and was not supported by substantial evidence." Subsequent paragraphs of the petition set forth six specifications of alleged error in the Board decision and various particulars of failure of support by substantial evidence. These allegations are repeated and enlarged upon in plaintiff's answer, cross-motion, and brief.

My review of the proceedings before the Board convinces me that if the errors alleged by plaintiff were admitted,[25] and if the elements upon which plaintiff relies for failure of support by substantial evidence were withdrawn, there would still remain support by substantial evidence for the crucial finding by the Board and for its decision. Moreover, the modifications of the record for which plaintiff contends would not warrant a conclusion that the Board action was arbitrary or capricious. I therefore conclude that the decision of the ASBCA

---

23. Hereinafter ASBCA.

24. Paragraph 7, page 3.

25. "The finality of the board's decision as permitted under the language of the disputes clause, as well as under the Wunderlich statute is not to be defeated nor the existence of a material dispute of fact to be shown merely by plaintiff's desire to have a trial here in order to correct errors and omissions which may have been made in the proceedings before the board." P.L.S. Coat & Suit Corp. v. United States, 180 F.Supp. 400, 405, 148 Ct.Cl. 296, 304 (1960).

was final and conclusive with respect to the declaration of default and the retention of the $25,000 bid deposit as liquidated damages.

### III

Plaintiff's demand for return of the $17,000 paid to FHA with its application for an insurance commitment is a separate claim, on which neither the contracting officer nor the ASBCA made any decision.

Plaintiff's bid contained the following statement:

> 7. The bidder understands that, if selected as lowest acceptable bidder, he is obligated to pay prior to or at the time of closing with FHA * * * three-tenths (3/10) of one percent of the principal amount of the mortgage for the FHA commitment, filing and processing fees * * *.[26]

Plaintiff's application for the commitment for insurance was made on May 4, 1959. The application was accompanied by payment of $17,000, as required by FHA regulations. The commitment was issued on June 4, 1959.

Defendant insists that it is entitled to retain the $17,000 because the FHA had earned the fee by processing plaintiff's application. It says that the purpose of the fee was to compensate FHA for the appraisal of the property or project offered for insurance and for processing the application and issuing the commitment.

The statutory authority for FHA's participation in Capehart housing is contained in §§ 1748–1748i of Title 12, United States Code, being Subchapter VIII (entitled Armed Services Housing Mortgage Insurance) of Chapter 13 (National Housing). Section 1748a contains the following provision:

> * * * General expenses of operation of the Federal Housing Admin-

istration under this subchapter (including operations with respect to mortgages insured or to be insured pursuant to this subchapter prior to August 11, 1955) may be charged to the Armed Services Housing Mortgage Insurance Fund. * * *

Section 1748c(b) directs that premium charges, adjusted premium charges, and appraisal and other fees, received on account of the insurance of any mortgage so insured shall be credited to the Armed Services Housing Mortgage Insurance Fund.

Section 1748b(a) authorizes the Commissioner (of FHA) to insure mortgages on Capehart housing upon such terms as he may prescribe and to make commitments for so insuring such mortgages prior to the date of their execution. Section 1748b(c) authorizes the Commissioner (1) to fix a premium charge for the insurance of such mortgages of not less than an amount equivalent to one-half of 1 per centum per annum nor more than an amount equivalent to 1½ per centum per annum of the amount of the principal obligation of the mortgage and (2) to require the payment of one or more such premium charges at the time the mortgage is insured.

Section 1748f authorizes the Commissioner "to make such rules and regulations as may be necessary to carry out the provisions of this subchapter."

Pertinent FHA regulations are contained in Title 24, Code of Federal Regulations (1959). Excerpts follow:

> Part 292a—Armed Services Housing Insurance; Eligibility of Mortgage

> Subpart A—Military Personnel

> Sec. 292a.3—Application fee.

> (a) No application will be considered unless the fee therefor has

---

26. Plaintiff's bid and "the principal amount of the mortgage" were, for this purpose, identical, in the amount of $11,332,820. Three-tenths of one percent of this amount is $33,998.46. This figure is reflected in the facts of the case by the

$17,000 paid at the time of the application for insurance commitment, and the balance of $16,998.46, for the payment of which plaintiff was granted extensions to October 2, 1959, when, upon failure of payment, the commitment expired.

been paid. This fee, referred to as the application fee, is $1.50 per thousand of the face amount of the loan applied for.

(b) If an application is rejected before it is assigned for processing by the Commissioner, or in such other instances as the Commissioner may determine, the entire fee or any portion thereof may be returned to the applicant. (As amended by 24 F.R. 5302, June 30, 1959.)

Sec. 292a.4—Issuance of commitment.

(a) Upon approval of an application for mortgage insurance a commitment will be issued setting forth the terms and conditions upon which the mortgage will be insured, including special requirements applicable to the project, and instruments evidencing full compliance satisfactory to the Commissioner with the provisions of this subpart and with such terms and conditions.

(b) The commitment will provide for advances of mortgage money during construction and the insurance of such advances as made.

(c) No commitment shall be valid unless signed by the Commissioner or his agent authorized for that purpose, and shall be effective for a stated period, not in excess of 120 days, provided, that the commitment fee shall have been paid as required. A commitment may be renewed in such manner as the Commissioner may from time to time specify.

Sec. 292a.5—Commitment fee.

A further sum, referred to as commitment fee, which when added to the application fee will aggregate $3.00 per thousand of the face amount of the mortgage loan set forth in the commitment shall be paid within 30 days subsequent to the date of the commitment, or within such additional period of time as may be agreed to in writing by the Commissioner.

It is apparent from the regulations that the insurance commitment fee was divided into two parts: (1) the application fee, payable with the application, and (2) the commitment fee, payable 30 days after issuance of the commitment, "or within such additional period of time as may be agreed to in writing by the Commissioner," except that the commitment would expire 120 days from date of issuance.

It is also apparent that the only reference to return of the application fee is contained in section 292a.3, authorizing return of the entire fee or any portion thereof to the applicant, *if the application is rejected before it is assigned for processing, or in such other instances as the Commissioner may determine.*

 My conclusions are: (1) that the Commissioner was authorized by the statute to require the fee; (2) that the requirement was validly imposed by regulation; (3) that the purpose of it was to cover the expense of processing the application; (4) that return of the fee or any portion thereof to the applicant was within the sound discretion of the Commissioner; (5) that the standards for the exercise of his discretion were reasonably stated in section 292a.3(b); and (6) that, since the Commissioner has refused to return the application fee to the applicant in this instance, plaintiff is not entitled to its return unless it appears that the refusal reflects an abuse of discretion.

The essence of plaintiff's contention is that the Commissioner (acting through the FHA Director in Honolulu) prevented plaintiff from closing the contract by his failure to take various steps which were the responsibility of FHA under the contract.

Plaintiff's position in this connection is both technical and anomalous. For example, central among the responsibilities of FHA in the closing process, as to which plaintiff complains of inaction by FHA, was the duty of FHA to make the

wage-price adjustment, for which the contract documents prescribed a formula. The contract documents are before the court only as exhibits filed by the parties in support of their respective motions. Plaintiff would refer to these exhibits for the provisions of the contract documents. Otherwise, it places reliance on negatives: that there is no showing (nor can there be a showing) that FHA complied with this provision or that.

Inasmuch as the parties are before the court on cross-motions for summary judgment, based upon agreed facts as supported by exhibits, the court may not be precluded by a technicality from referring to the exhibits for such light as they may shed upon the contentions of the parties. Such a reference reveals plaintiff's action, as well as the FHA's inaction. Plaintiff knowingly, and by preference, negotiated with the contracting officer for a preliminary understanding with respect to terms to be submitted by the contracting officer and plaintiff to FHA as the basis of action by FHA. These negotiations were never completed, and no submission was made to FHA, because of plaintiff's insistence upon a wage-price adjustment in excess of any computation authorized by the contract formula. When the negotiations reached an impasse, the contracting officer declared plaintiff to be in default.

Under the circumstances presented by the record on which the parties rely for support of their respective motions for summary judgment, there can be no conclusion that the retention of the application fee represented an abuse of discretion by the Commissioner of FHA.

Plaintiff is therefore not entitled to recover. I recommend, as the judgment of the court, an order which would (1) declare that plaintiff is not entitled as a matter of law to recover; (2) grant defendant's motion for summary judgment; (3) deny plaintiff's cross-motion for summary judgment; and (4) dismiss the petition.