Davis, Judge,
delivered the opinion of the court:*
In 1958-1960, plaintiff, a joint venture, constructed a Cape-hart Act Housing project for the Air Force on Guam, mainly with Filipino laborers imported from the Philippine Islands. The claim is that the defendant ordered plaintiff to pay these workers higher wages than was required by the contract, and that the United States should make reimbursement for these additional wage costs. The Government replies that the plaintiff was not compelled to pay wages any greater than those it agreed to pay when it undertook the project.
The invitation for bids (issued March 31,1958) indicated that the contractor would have to pay laborers and mechanics not less than the prevailing local wage as determined by the Secretary of Labor, and also overtime, beyond an eight-hour day, at time and one-half (see findings 13(c-d), 14). Accompanying the invitation was a Labor Department wage decision (S-9589), dated February 25, 1958, which specified hourly rates for 56 categories, ranging from 60 cents for laborers to 68 cents for operators of heavy construction equipment. Plaintiff’s bid (on May 26,1958) agreed to pay wages not less than those contained in the prevailing wage determination of the Labor Department. On June 16,1958, the Air Force sent plaintiff a Letter of Acceptability which *305 obligated both, parties. Anthony P. Miller, Inc. v. United States, 161 Ct. Cl. 455, 468, 469, cert. denied, 375 U.S. 879 (1963). The closing was scheduled for August 29,1958, but was not in fact consummated until September 8th. Performance began late in September 1958.
Since Wage Decision S-9589 expired, by its own terms, on May 27, 1958, a new determination had to be obtained — as provided in the Letter of Acceptability. Plaintiff and the Air Force requested another finding and on July 16,1958, the Labor Department issued Wage Decision S-25,245 (to expire October 15, 1958) which set forth the same categories and rates as in S-9589 (the February wage decision).
On September 17,1958, after conferences and communications which indicated that plaintiff did not interpret S-9589 and S-25,245 in the same manner as the Labor Department, that agency issued a third determination, Wage Decision T-5369, in which wage rates of $1 to $1.08 replaced the former wage rates of 60 cents to 68 cents, but which made it clear that certain costs could be deducted from the payments. As already indicated, the formal contract was closed in September 1958. In performance, plaintiff followed its understanding of the September determination and paid those wages. The contract was substantially completed about the middle of July 1960, and plaintiff was paid the total price (over $20,000,000), including all changes.
The primary claim, as the case was tried, was that Wage Decision T-5369 (in September 1958) raised the prevailing wage rate over the earlier determinations of February and July 1958 (S-9589 and S-25,245) from 60-68 cents to $1-1.08. If one looked simply at these hourly rates, one could hardly disagree that a drastic increase had been made; one dollar per hour is indisputably more than sixty cents per hour. The problem arises because of the special system by which Filipino laborers on Guam were paid. Under the Embassy Agreement of 1947 between the United States and the Philippine Islands, governing the employment of Filipino laborers by the American military and its contractors outside of the Philippines, such Filipino personnel were to receive in kind quarters, subsistence, and hospitalization (for which they would be charged) and, also, certain free benefits (laundry, *306 emergency medical services and dental care, and certain transportation) . The whole bundle of these rights — both those for which the men would have to pay and those they would receive free — is known to this record by the surprisingly formal designation of “perquisites.” There is no doubt that, in its determinations of February and July 1958, the Labor Department subjectively intended the scale of wages (60 to 68 cents per hour) to represent cash wages only; it was expected that the employer would provide perquisites in addition to the cash wages, but there was no mention of that element in the wage determinations themselves. It is likewise clear that, in its September decision which came after the problem erupted into the open in acute form, the Labor Department intended to cover, in the sums specified, both cash wages and the cost of the perquisites chargeable to the workers.
Plaintiff’s original contention was that, before it bid in May 1958, it did not know, and had no reason to know, that the initial wage determination was designed to set an hourly minimum of 60-68 cents flus perquisites, and that the company could properly assume that 60-68 cents represented the total wage (including perquisites), out of which the employer could deduct the cost of lodging and subsistence. The Government argues, on the other hand, that plaintiff actually knew, or reasonably should have known, that perquisites were to be added to the 60-68 cent rate — or, at the least, that plaintiff should have inquired before making its bid.
Much of the trial before Commissioner Evans centered on this controversy. The plaintiff’s witnesses testified as to its understanding and what they did to find out the prevailing wages on Guam. Defendant’s witnesses, principally an Assistant Solicitor of Labor, emphasized the Labor Department’s understanding. Commissioner Evans concluded, on all the evidence, that plaintiff had not borne its burden of showing that it was not on notice, before it bid, that there was a definite problem as to the place of perquisites. In the words of the trial commissioner’s memorandum opinion:
“The aspect of the case which makes the decision difficult is the spread of 8,000 or 10,000 miles between the locale of the work (Guam) and the place (Washington, D.C.) where the wage determination was made. Without doubt, the Department of Labor would never have *307 exposed an orthodox wage determination to interpretation on Guam without some qualifying explanation if the conditions existing on Guam had been known to it in greater detail. By the same token, there can be no doubt but that the plaintiff-contractor would have made inquiry in depth as to the intention of the Department of Labor if its representative (Mr. Black) had been more conversant with the history of the various labor standards statutes and of the practices of the Department of Labor in administering them.
302_. __ Opinion of the Court
“As the situation developed in fact, the Department of Labor, operating out of Washington in conformity with well-established practices applicable to the continental United States, relied upon information obtained by correspondence from representatives of other Government agencies and their contractors on faraway Guam. The contractor, on the other hand, sent its representative, Mr. Black, from his home in Honolulu to Guam [late in March 1958] to gather at the source the requisite information on wages and working conditions.
* # * #
“Mr. Black testified * * * that he did not know that the 60-cent rate represented cash wages exclusive of fringe benefits; that he considered 60 cents per hour to be the rate of gross wages; and that he relied upon this conclusion (based upon his own interpretation of the official determination of prevailing wages) in the preparation and submission of plaintiff’s bid. He did not testify that he knew (in the sense of being positive, or holding a conviction untroubled by doubt) that the 60-cent rate represented gross wages from which the cost of perquisites would be deductible.
“The evidence as a whole warrants the conclusion that Mr. Black left Guam with some question in his mind, however vague or inarticulate it may have been, as to whether the 60-cent rate would be subject to deduction of the cost of perquisites. Thereafter, he resolved the doubt and proceeded to prepare and submit plaintiff’s bid as recounted in the findings in reliance upon the similarity he found between the Hawaiian wage rate and the Secretary’s prevailing wages, assuming the latter to represent total wages.
“It was not until after his bid had been submitted that recurring doubt induced him to make specific inquiry. * *
Plaintiff now accepts the commissioner’s factual finding that it was on notice that the wage determination of Febru *308 ary 1958 was ambiguous as to the role of perquisites, i. e. whether the contractor, in addition to the 60-68 cent per hour cash wage, was to furnish perquisites. On that finding, there is no doubt that plaintiff cannot recover on its major claim. This was a most serious ambiguity; plaintiff first asked for damages of over $1,300,000 as attributable to the alleged increase in wages rates, and only limited its claim to some $875,-000 because of the statutory maximum on Capehart Act projects. The chief representative of the j oint venture was aware of the ambiguity, and of its gravity, but did not seek to clarify it before bidding.[1] The Bid Invitation expressly warned the bidder to:
“carefully examine the provisions of the form of the Housing Contract attached hereto, including the Drawings and Specifications made a part thereof; visit the site of the Housing Project; and fully inform himself as to all conditions and matters which can in any manner afect the financing of the construction and the constructing of the housing projects or their cost. Should the bidder find discrepancies in, or omissions from, such Drawings and Specifications or other documents attached hereto, or should he be in doubt as to their meaning, he should at once notify the Contracting Officer, Offutt Air Force Base, Nebraska and obtain clarification prior to submitting a bid. Information given will be transmitted to all known interested bidders” (emphasis added).
This is exactly the kind of case in which we have held that the contractor cannot “bridge the crevasse in his own favor”, without suffering the consequences. Beacon Constr. Co. v. United States, 161 Ct. Cl. 1, 6-7, 314 F. 2d 501, 504 (1963). See, also, Ring Constr. Corp. v. United States, 142 Ct. Cl. 731, 734, 162 F. Supp. 190, 192 (1958); Jefferson Constr. Co. v. United States, 151 Ct. Cl. 75, 89-91 (1960); WPC Enterprises, Inc. v. United States, 163 Ct. Cl. 1, 6, 7, 323 F. 2d 874, 877 (1963); Blount Bros. Constr. Co. v. United States, 171 Ct. Cl. 478, 496-97, 346 F. 2d 962, 972-73 (1965). The result is that plaintiff is bound by a wage determination (the Feb *309 ruary-July rulings) which impliedly provided that, the total wage included perquisites and in which the specified cash sum was not the total wage. Contrast Tufano Constr. Corp. v. United States, post, p. 398.
There is a subordinate claim for the difference of 8 cents for straight time (plus overtime) between the cash wages listed in the February-July wage determinations (60-68 cents) and the cash wages actually paid by plaintiff under the September determination specifying $1.00-$1.08 per hour. As we have said, the latter decision plainly covered both cash wages and perquisites, and as to that plaintiff had no doubt. The rub is that the Government allowed plaintiff, under the Embassy Agreement, to deduct only 32 cents from the hourly wages ($1-$1.08) for perquisites charged to the laborers, and therefore required the contractor to pay 68-76 cents in cash (for straight-time). The defendant’s position is that this was not an increase over the first wage determination in February because that decision, from the beginning, meant the wage to be a total of $1 (divided at that time into 60 cents in cash plus 40 cents for perquisites); to the Labor Department the important fact about the February decision (reaffirmed in July) was that the minimum wage was to be $1; perquisites were estimated to be 40 cents but, if they should turn out to be less, the full $1 would still have to be paid. It follows, in the Government’s eyes, that the actual allowance for perquisites is immaterial in determining the wage; the contractor was at all times required to pay a dollar an hour; the permissible cost of perquisites (whatever that happened to be at the particular time) could be deducted, but the rest of the dollar would have to be paid in cash. Defendant seems to add that plaintiff knew this all along.
Our starting point must be the commissioner’s explicit finding, with which we have no reason to disagree, that plaintiff did not actually know that the 60-cent rate (established in February) represented cash wages exclusive of perquisites, but, on the contrary, plaintiff considered 60 cents per hour to be the rate of gross wages. Finding 28(b) (c).[2] A corol *310 lary is that plaintiff did not actually know that the minimum wage set in February was $1 per hour, consisting of cash plus perquisites. We have held, however, that, regardless of its subjective understanding, plaintiff must be held, because of its failure to ask, to the obligation to pay at least 60 cents per hour plus perquisites. Is plaintiff also to be charged with notice that the February wage-decision contemplated that the perquisites would always be valued at 40 cents, despite any lesser amount which could actually be taken on their account from the workers’ cash wages? We think not. As we see it, the most to which plaintiff can be held is that it was to pay 60 cents in cash plus whatever the amount at which perquisites would be valued at a particular time. In short, under the February ruling plaintiff’s obligation was to pay 60 cents plus perquisites — not a total of $1.
Significantly, that determination listed only a scale of 60 to 68 cents, nothing more. There was no mention of the cost of perquisites. In arriving at the determination, the Department of Labor predicated its findings on wages paid by Hawaiian Dredging, a large Navy contractor. These wages consisted of cash wages of 60 to 68 cents plus perquisites provided at a then allowable, deductible cost of 40 cents. The reasonable cost of perquisites was, however, subject to determination in each individual case and in each case was subject to review and revision from time to túne.
As we have said, bidders (actual and potential) interested in the housing project should have reached a conclusion contrary to that reached by plaintiff as to the scope of the wage *311 determination. Specifically, they should have concluded that the scale of 60 to 68 cents represented cash wages, and that the cost of perquisites would be additional. From that point forward, they would have had to live with the facts of life in relation to the allowable cost of perquisites, and to compute their bids on the best guesses they could make as to (1) the actual cost to them of perquisites and (2) their chances of persuading the Department of Labor that such cost was reasonable and therefore fully deductible.[3] The guessing, however, would be limited to the cost of perquisites, actual and allowable. Any bidder was entitled to believe that he had a firm base from which to start — the wages payable in cash— assuming only that labor was available at such rates. There was nothing on the face of the wage-decision or the contract or the bid-invitation which should have led a bidder to inquire whether he would have to pay greater cash wages if the cost of the perquisites was reduced from the then sum of 40 cents. That may have been the undisclosed intention of the Labor Department’s officials, but their latent inner view did not at all break into written words or into any external manifestation of which plaintiff should have been aware. On this point Mr. Black was not put on notice. He had doubts whether perquisites were additional to the cash wages, but there is no showing of a doubt, or any reason to doubt, that the only cash wages to be paid would run from 60 to 68 cents and that perquisites could vary in amount. In other words, plaintiff was not put on notice — by anything in the wage-decision, the contract documents, or the surrounding circumstances — that the minimum wage established in February was a flat $1-$1.08 per hour, rather than 60-68 cents cash plus perquisites (whatever perquisites should happen to come to).
It is irrelevant that, as defendant argues, plaintiff knew, when it made its inquiry in March 1958 into labor rates on Guam, that perquisites then amounted to 40 cents.[4] There is, as we have pointed out, no showing that plaintiff knew (or should have known) that, if that figure was later reduced to *312 32 cents, the employer would still have to value perquisites at the higher sum and pay the excess to the workmen over and above the stated cash wages of 60-68 cents. Only if there was knowledge, actual or imputed, that the February determination set a total minimum wage of $1-$1.08 would it make any difference that the contractor was aware that in February-Maroh 1958 perquisites were worth 40 cents. The commissioner’s conclusory findings (findings 28 (b), (c)), supra, fn. 2), which we adopt, lead inevitably to the conclusion that plaintiff did not actually have that knowledge, and we have held that there was nothing to put it on notice.
The result must be that, since the Labor Department did not reveal its secret mind (in this respect) in the February-July determinations, the plaintiff was privileged to take those decisions at their face value. To the contractor and to the world outside the Labor Department and the Air Force, there was a change, an increase in total wages, between February and September. It is settled that, where the Government requires a contractor to pay higher wages than he was obligated to do under Ms contract, the United States is liable for the additional costs. Sunswick Corp. v. United States, 109 Ct. Cl. 772, 75 F. Supp. 221, cert. denied, 334 U.S. 827 (1948) ; Bateson-Stolte, Inc. v. United States, 158 Ct. Cl. 455, 459, 305 F. 2d 386, 389 (1962). Moreover, plaintiff’s agreement with the Government acknowledged the contractor’s right to an increase in price if the initial wage determination was raised by the Labor Department.[5] No price increase was granted because the Air Force thought that the September wage decision did not result in any lifting of wage rates over the earlier determinations of February and July. The Federal Housing Administration felt that it had no authority, though “it appears that the September 17,1958, wage determination by the Department of Labor did result in a wage increase”, because the Air Force would not request an advancement in price. Plaintiff’s redress must be in court.
The damage suffered was the increase in cost thus ordered by the Government. Defendant argues vigorously that, de *313 spite tlie increase, there was no injury because plaintiff made a substantial profit and because its actual labor costs were less than had been anticipated in the preparation of the bid. We agree with the trial commissioner that these facts, if such they be, are irrelevant.[6] Plaintiff was entitled to expect that, absent a price increase, it would not be ordered to pay more than the original wage decision required. That was its contractual right. Since plaintiff was directed and did have to pay such higher wages, it has been damaged. The project could have been completed for less money if these higher wages had not been prescribed. Thence the injury.
As to straight time the computation is clear. There were 2,174,150.5 such hours and the wage increase was 8 cents— from 60-68 cents to 68-76 cents (i.e. $1-$1.08, less 32 cents for perquisites). This adds up to $173,932.04.
In calculating the overtime increase, the commissioner multiplied the 8 cent hourly increase by time and one-half, giving 12 cents. The overtime hours are agreed to have been 619,754.5. The result is $74,370.54. Plaintiff complains of this use of 12 cents as the hourly sum for the overtime increase. The correct figure, we are told, is 60 cents. This is reached by saying that, under the original wage determination of February 1958, the overtime rate was 90 cents (1 y2 times 60 cents), while under the September decision that rate was $1.50 (iy2 times $1). The fallacy is that plaintiff is comparing the original rate without the perquisites to the later rate including the perquisites. In the one case the overtime is computed on the cash wage alone, in the other on the cash wage plus the perquisites. Such different methods for calculating overtime were not required by the terms of the two determinations — and no statute, regulation, or agreement demanded this variance in treatment.[7] On the contrary, the Labor Department insisted, as plaintiff knew when it began performance, that the September determination was merely a *314 clarification of the prior decisions, putting the same concept into different words. The method for calculating overtime should therefore have been the same under both sets of determinations. As defendant points out, an overtime differential of 12 cents is obtained whether one compares the two cash rates or the cash rates plus the perquisites.[8] It is only when the basis of the calculation is incorrectly shifted that plaintiff’s overtime figure of 60 cents emerges.
Accordingly, plaintiff cannot rely on the texts or implications of the two wage decisions for the change in method of computation which is proposed. We are not certain what was the proper overtime (see footnote 8), but we are persuaded that the. same method, whatever it was, was applicable to both decisions. It is unnecessary to go further, for the increase due to the Government would be no more than 12 cents in any event. Furthermore, there is neither evidence nor finding that the contractor was directed by any government official to pay overtime (after the September determination) at $1.50 per hour. To the extent that excessive overtime may have been paid, plaintiff did so voluntarily and cannot recoup from the Government. See Kirchhof v. United States, 121 Ct. Cl. 476, 491, 102 F. Supp. 770, 773-74 (1952) ; Ross Eng'r Co. v. United States, 130 Ct. Cl. 368, 373-74, 127 F. Supp. 580, 583 (1955).
The wage increase attributable to the defendant was $248,302.58 ($173,932.04 straight time plus $74,370.54 overtime) . Plaintiff is entitled to recover that amount and judgment is entered to that effect.
FINDINGS OE FACT
The court, having considered the evidence, the report of Trial Commissioner W. Ney Evans, and the briefs and argument of counsel, makes findings of fact as follows:
*315 1. (a) Guam, the largest of the Mariana Islands, was administered by the United States as a naval base from the time of its acquisition from Spain in 1898 until its capture by the Japanese during World War II.
(b) Following liberation, and effective August 1, 1950, the administration of the island was transferred from the Secretary of the Navy to the Secretary of the Interior[1] pursuant to the terms of the Organic Act of Guam,[2] enacted the same day.
(c) As the Korean episode (begun in June 1950) unfolded, each of the three armed services (Army, Navy, and Air Force) developed installations on Guam. During the times material to this action (covering approximately 1 year, October 1957 through September 1958, each of the three services was responsible for the employment of civilian labor (either directly or through contractors) in the construction of facilities and in the administration of bases.
2. (a) Construction labor (skilled, semiskilled, and unskilled) was drawn from foreign as well as domestic sources and included Filipinos (counted as foreigners because the Philippine Islands then constituted an independent nation) and Guamanians, as well as workmen from the continental United States and Hawaii.
(b) Wage rates payable to workmen from the continental United States and Hawaii were fixed by collective bargaining and are not in issue here. Their relevance to this case lies only in their relation to the spread of wage rates on the Island of Guam, as hereinafter noted.
(c) Wage rates payable to Guamanian workmen are likewise of incidental interest here. There was a special scale of wages applicable to them, and they were entitled to priority upon application for job openings. However, the applicants were, by and large, owners or operators of small *316 farms, who usually found the physical demands of construction labor unduly onerous, as a consequence of which they came to represent only a floating pool in the labor market.
(d) This case is primarily concerned with the wage rates payable to Filipino workmen, who were employed in large numbers on construction work on Guam. In addition to construction laborers, many Filipinos were employed on Guam by such service facilities of the Armed Forces as post exchanges and officers clubs and by privately owned business firms,
3. (a) The Organic Act of Guam provided (1) that “The laws of Guam in force on August 1, 1950 * * * are continued in force, subject to modification or repeal by the Congress of the United States or the Legislature of Guam * * *” and (2) that “* * * no law of the United States hereafter enacted shall have any force or effect within Guam unless specifically made applicable by Act of Congress either by reference to Guam by name or by reference to‘possessions’ * * *.”[3]
(b) Subject to two exceptions hereinafter noted (pertaining to the Fair Labor Standards Act and portions of the National Housing Act), none of the variety of statutory requirements pertaining to labor standards had been made specifically [4] applicable to Guam at the times here material.[5]
4. (a) During the times material to this action there was in effect an arrangement between the Governments of the United States and the Philippine Islands, known as the Embassy Agreement. The Agreement was made in May 1947 by an exchange of notes.[6] Its purpose was to record mutually satisfactory terms for the employment by the United States Army of Filipino laborers to work outside of the Philippines.[7] Both Governments sought an arrange *317 ment whereby the Filipino laborers could be recruited directly in the Philippines by Americans or their agents, transported to the site of the work, employed and subsisted, and returned to their homeland when the work was finished. The objective was so well attained that the agreement was in time accepted as covering Filipino laborers recruited for work on Guam by all three of the Armed Forces and by the contractors working for them.
(b)Following are pertinent excerpts from the Embassy Agreement:
Insofar as Filipino employees who are hired directly by the United States Government at any place outside the Philippines are concerned, the United States Army will in all cases agree to the payment of an increase in the current Philippine wages of 15 centavos per hour in lieu of free quarters and subsistence suggested by Your Excellency’s Government, plus a 25% overseas differential, and then charge all employees for quarters and subsistence as furnished. The charges for quarters and subsistence will be as follows:
(a) Quarters — 3*2.00 per month.
_ (b) Subsistence — 90 centavos per day for the Philippine Scout ration, or 3*1.50 per day for the regular U.S. Army Ration, whichever is furnished.
In addition to the above, the following benefits affecting Filipino personnel employed directly by the Army are offered:
(a) Free Laundry facilities.
(b) Free medical services and dental care of an emergency nature while outside the Philippines.
(c) Guaranteed transportation to and from point of hire regardless of the reason for separation from duty.
(d) Pay while in a travel status not to exceed 40 hours a week, except while in a return travel status after having removed for cause or for quitting the job.
(e) Treatment and compensation for service connected injuries and death by the United States Federal Security Agency, Bureau of Employees’ Compensation for Government employees.
(f) _ Overtime payment at 1 y2 times the basic rate for work in excess of the regular 40-hour weekly tour of duty performed by all employees. Laborers and mechanics will also be paid 1% times the basic rate for work performed in excess of 8 hours per day for which overtime compensation is paid will not count towards completion *318 of tbe 40-hour week required for payment of overtime on a weekly basis.
(g) Pay for absence on U.S. holidays, which are the only holidays celebrated on Guam. If work is performed on those holidays, holiday payment will be made at the rate of time and one-half of basic compensation.
5. (a) The Embassy Agreement represented the full extent of labor standards applicable to Filipino workmen on Guam from the time of its inception until sometime in late 1957.
(b) Illustrative of the operation and coverage of the Agreement is a contract made on June 7, 1957, between the Navy [8] and the Marianas Stevedoring & Development Co., Inc.[9] (hereinafter Masdelco), whereby Masdelco undertook to furnish personnel for the Navy. Pursuant to the undertaking, Masdelco was to recruit the workmen, provide transportation to and from Guam, manage subsistence facilities at the Navy’s Roxas Village, and pay the workmen’s wages in conformity with fixed wage schedules.
(c) The hourly wage schedule (identified as Schedule A) provided “pay levels for Marianas Labor Services Contract (fiscal year 1958)” in terms of nine “levels,” designated by letters A through I, with four “steps” in each level. Five attachment sheets listed 126 categories of occupations, each of which was assigned to a level. The only occupation in level A was engineer, for which the wage in step 1 was $2 (rising to $2.86 in step 4). Level B, with wages ranging from $1.32 to $1.82, included such occupations as managing steward and statistician. The middle level, E, included such occupations as accounting machine operator, boilermaker, electrician, heavy equipment operator, statistical draftsman, and welder, and carried a wage range of 62 cents to 78 cents. The very lowest level, I, carried a wage rate of 32 cents in step 1 to 40 cents in step 4, and included janitors and laborers. Level H, next lowest, provided a wage range of 36 cents to 52 cents for such occupations as gardeners, helpers (general and kitchen), light equipment operators, munition handlers, stevedores, and waiters.
*319 6. (a) In 1952, portions of the National Housing Act[10] were extended to include Guam.[11] The so-called Capehart Housing Act,[12] under which the contract in suit was made, was an extension of the National Housing Act. The last-named statute contains a labor standards provision[13] which requires a building contractor to certify to the Federal Housing Commissioner that—
* * * the laborers and mechanics employed in the construction of the * * * project * * * have been paid not less than the wages prevailing in the locality in which the work was performed for the corresponding classes of laborers and mechanics employed on construction of a similar character, as determined by the Secretary of Labor prior to the beginning of construction and after the date of the filing of the application for insurance. * * *
(b) Application of the foregoing labor standards provision was not implemented until sometime in 1957, when construction under the Housing Act was first undertaken on Guam.
(c) The premise of the undertaking of construction contracts under the Housing Act raised the whole issue of statutory labor standards. Since the statutes themselves were not specifically applicable to Guam (except for the Fair Labor Standards Act, made applicable in November 1957), the armed services adopted the practice of writing some or all of the statutory requirements into their contracts. The provisions thus inserted in the contract in suit are listed in finding 14.
(d) Thus, it was not until the fall of 1957 that the Department of Labor became concerned with the application on Guam of various statutory labor standards provisions administered by it. Prior to that time there had been (1) no determinations of prevailing wages, as required by the Davis- *320 Bacon Act;[14] (2) no interpretations of “commerce” under the Fair Labor Standards Act;[15] (3) no application of (the statute or regulations pertaining to) the Copeland Act[16] and the Anti-Kictback Act;[17] and (4) no enforcement of overtime provisions (other than the requirements of the Embassy Agreement).
(e) As a consequence of the sudden intrusion of labor standards on such an extensive scale, wide disparities appeared in the rates of wages payable to Filipino workmen employed on Guam.
■7. (a) The Act of August 30,1957,[18] provided that 90 days after its enactment (November 29, 1957), the minimum wage and maximum hour provisions of the Fair Labor Standards Act of 1938, as amended,[19] should be applicable to Guam.
(b) On October 23, 1957, the Wage and Hour and Public Contracts Divisions of the United States Department of Labor issued “A Statement on the Fair Labor Standards Act on Guam and Wake Island.” The following excerpts from the Statement are pertinent here.
The Fair Labor Standards Act has been amended, effective November 30, 1957, to provide that employers on Guam and Wake Island are thereafter liable for wages due under the Act to any of their employees who are covered by the Act’s provisions. * * *
The Act applies to any employee engaged in, or producing goods for, interstate or foreign commerce. Employees so engaged must be paid not less than $1.00 an hour and time and one-half their regular rates of pay for all hours worked in excess of 40 in the workweek * * *.
An important rule to keep in mind in determining whether your employees are entitled to the Act’s benefits for a particular week is that the Act’s coverage is determined on the basis of each workweek standing alone. Stated in another way, this simply means that the Act does not apply to the employee in a week when he performs no covered work. On the other hand, if he regularly performs covered work, even though only *321 a small amount, lie is covered by the Act for all hours worked in any week in which he does such work, and must be paid in accordance with the Act’s requirements for all hours worked in that week, including time spent in noncovered work. This rule should be of particular interest to those employers having employees engaged in both covered and noncovered work in any workweek.
The following illustrations are typical of the kinds <A work performed in Guam which are covered by the
1. Naval and Air Bases
Facilities at the air and naval bases on Guam are the very means on which much of the commerce to and from the island depends. These are existing facilities and “instrumentalities” of interstate commerce, and any employees whose work aids and facilitates the operation of these facilities are covered by the Act. While employees of the Government itself are excluded from this law, all other covered workers must be paid in accordance with the Act.
2. Construction Work — Covered
Employees performing work on a project for the maintenance, repair, alteration, improvement, extension, or enlargement of existing facilities of interstate or foreign commerce, such as airports, docks, piers and other port facilities, warehouses where goods moving to and from the island are stored, communications centers, bridges, highways and railroads, are covered by the Act. This would include not only those employees engaged in the actual construction work, but also all other employees who take part in the integrated effort, such as time keepers, watchmen, truck drivers hauling the required materials, laborers who unload the trucks, and office personnel who procure the materials, keep the necessary records or make up the payrolls.
Thus, employees working on contracts for construction work such as the following would be covered by the Act:
(a) Paving and extension of air strips at air fields;
(b) Improvement of the navigational facilities at airfields;
(c) Maintenance, repair or improvement of ship repair facilities, warehouses and operations buildings at air fields and naval bases;
(d) Repair and rehabilitation of aircraft docks;
(e) Maintenance, repair and improvement of the road system at naval or air bases;
*322 (f) Supplying materials used in surfacing the roads and landing areas ;
(g) Performing engineering and architectural work in connection with the above-listed construction projects.
3. Local Construction Work — Not Covered
Some construction work is “local” and employees working on such projects are not covered by the Act. Construction work on residential housing, stores, schools, churches, clubs, hospitals and post exchanges are some examples of this kind of work. Accordingly, employees working on contracts for the maintenance, repair or construction of such buildings would not be covered by the Act. However, if the employees in the same week perform any work that is covered, they would be covered by the Act for all hours worked in that week, including time spent in the “local” work.
$ * $ $ id
Board, Lodging and Other Facilities
The wage paid to an employee includes, under section 3 (m) of the Act, the reasonable cost to the employer of board, lodging or other facilities customarily furnished to his employees. Consequently, employers may offset or count against the minimum wage the reasonable cost, as determined under the Administrator’s regulations, of certain articles and services furnished to his employees. There may also be offset against the wages any sums advanced to the employee or paid on his behalf at his direction. * * *
* * * * *
(c) Sometime in November (or late October) 1957, the Chief, Bureau of Supplies and Accounts, Navy Department, forwarded to the Commanding Officer, Naval Supply Depot, Guam, information on wage schedules under the Marianas Labor Services Contract which directed that—
* * * Schedule A is the wage schedule implemented on July 1 of the current fiscal year and will remain in effect where applicable until June 30,1958.
* * * Schedule A-l [attached to the directive] establishes wages based on $1.00 an hour (including fringe benefits) as required by the Overseas Fair Labor Standards Act. * * *
Contract employees not receiving an hourly wage increase under the Overseas Fair Labor Standards Act will continue to work under their existing individual *323 contracts of employment with all benefits provided therein, continuing until the expiration of said contract.
* * * All contract employees will receive overtime pay as set forth in Schedule A-2.
8. (a) At this time (November 30,1957), a Navy construction project on Guam was nearing completion under a contract with a joint-venture contractor known as Hawaiian Dredging-Pomeroy-Koster, of which Hawaiian Dredging & Construction Co., Ltd., was the sponsoring organization.[20] Employees of the Navy contractor were affected by the Fair Labor Standards Act (hereinafter sometimes FLSA) in the same manner and to the same extent as were the Navy’s own “contract” employees. The Navy, accordingly, undertook the issuance of change orders to reimburse the contractor for the added expense of increased wages where and as required.
(b) The requisite adjustment of wages and reimbursement entailed tedious examination and analysis of weekly payrolls throughout the project, beginning November 30, 1957, and extending well into the year 1958. Hawaiian Dredging took the position, with the tentative approval of the Navy and acquiescence by the Department of Labor, that the new wage scale of $1 per hour minimum was subject to a breakdown reflecting 60 cents in cash wages and 40 cents (deductible by Hawaiian Dredging) for subsistence.
(a) As heretofore noted, the payrolls of the armed services (their bases and facilities and their force account work) and of their contractors included many Filipinos who had been recruited, transported, employed, and subsisted in the manner indicated by the Navy contract with Masdelco, outlined in finding 5(b).
(b) Wage rates payable to many (if not most) of these Filipinos were quite low when compared to American standards. The floor is reflected by the range of 32 cents and 38 cents payable for the first steps in levels I and H of the Navy Labor Service Contract.[21]
(c) At the time of the Navy’s Labor Service Contract (June 1, 1957), and continuing through the times material *324 here, the minimum wage rate in the Philippines (under Philippine law) was 4 pesos per day. On the free exchange a peso was then worth about 25 cents in American money, although on the regulated exchange, the value was 50 cents. In American money, therefore, the Philippine minimum wage was either $1 or $2 per day (12.5 cents or 25 cents per hour). Because of the exchange situation, and also as a result of extensive unemployment in the Philippines, large numbers of Filipino workmen were available for and were actively seeking employment at dollar wages.
(d) Translating such employment into Embassy Agreement terms, with recruitment, transportation, and subsistence provided by Masdelco or a similar service organization, there were many Filipino workmen employed on Guam at wage rates, in terms of take-home pay, in the bracket of the low and middle 30’s (in cents per hour).
(e) Beginning November 30, 1957, the application of the FLSA resulted in a marked increase in take-home pay for those Filipino workmen who were within the Act’s coverage. The Navy’s directive[22] that “* * * Schedule A * * * will remain in effect * * * until June 30, 1958 * * *” meant, as it specifically said, that “Contract employees not receiving an hourly wage increase under the * * * Act will continue to work under their existing individual contracts * * * until * * * expiration * * As a consequence, Filipino workmen, living side by side at such subsistence compounds as Koxas Village, found themselves subject to disparities in wage rates as wide (almost) as 100 percent for performance of identical labor.
10. (a) By letter dated December 4,1957, the Air Force[23] submitted to the Davis-Bacon section[24] of the Department of Labor a request for a wage determination to be used in the Invitation for Bids on the contract in suit.
(b) Enclosed with the request was “a Guam wage schedule, dated February 1957,” based on a 3-month survey by the project’s architect-engineer. Hourly rates were set forth *325 for some 50 to 75 categories, reflecting odd ranges (e.g\, carpenters, from 46.5 cents to $1.25, with carpenter foremen at 84 cents) and wide disparities (e.g., laborers, 32.5 cents, with, excavation laborers at $1 and $1.25). Of the 133 rates specified, 50 were below 60 cents, while 36 others were above 60, but below 70 cents.
(c) The Wage Determination Division found this survey inadequate for its purposes and made further investigation, in the course of which it learned that Hawaiian Dredging was the largest employer of labor on Guam and that the wages being paid by it to Filipino workmen at the time (under FLSA) were based on a scale of $1 per hour minimum, payable 60 cents in cash and 40 cents for perquisites.
(d) On February 25,1958, the Secretary of Labor (acting through the Solicitor of Labor) issued Wage Decision S-9589, valid from date of issue to May 27, 1958, as applicable to Capehart housing on Guam. Hourly rates were specified for 56 categories, in a range beginning at 60 cents for laborers and rising to 68 cents for operators of heavy construction equipment, with hourly rates for other skilled 'and semiskilled crafts distributed between the floor of 60 cents and the ceiling of 68 cents.
(e) This scale of wages (60 to 68 cents per hour) was intended by the Wage Determination Division to represent cash wages. The Division anticipated that perquisites would be provided by the employer, but made no mention of perquisites in the Wage Decision.
(f) On February 27, 1958, the foregoing Wage Decision was forwarded to the Air Force on Guam and by it transmitted to the Regional Director of the Federal Housing Administration in Honolulu, for reference by him in his preparation of the FHA Estimate of Replacement Cost.[25] The Air Force letter of transmittal said:
* * * It is understood that this Determination does not include any allowance for fringe benefits, such as transportation, housing, etc.
*326 This comment by the Air Force was never communicated to plaintiff.[26]
(g) On March 11, 1958, the Department of Labor rescinded its prior acquiescence in $16 per week[27] (40 cents per hour) as the cost of subsistence, and notified Hawaiian Dredging of its approval of a cost allowance of $13.75 per week (34.375 cents per hour).
No modification of Wage Decision S-9589 was made to reflect this change in the allowable cost of subsistence.
11. (a) In the early months of 1958, public announcement was made of plans for two new construction projects on Guam. One was to be built for the Navy and was of such nature as to require the application of the FLSA; the other was the Air Force project for Capehart housing at Andersen Air Force Base, to which the FLSA did not apply.
(b) In late March 1958, Mr. Bobert E. Black, president of E. E. Black, Ltd. (a Hawaiian-based corporation), went to Guam to investigate wages and working conditions (including the relative efficiency of Filipino labor) in behalf of the plaintiff joint venture, of which he and his company had been the initial sponsors,[28] with a view to bidding on both upcoming projects on Guam.[29]
(c) Through previous visits to the Philippines and to Guam (not in connection with his current trip) Mr. Black was generally familiar with the recruitment and employment of Filipino labor. He knew something of employment conditions and wage rates in the Philippines and on Guam. *327 He either knew or soon learned of the Embassy Agreement. He was acquainted with officers and agents of Masdelco and of the Hawaiian Dredging & Construction Co., Ltd., the latter being an intense competitor in Hawaii and elsewhere with his own firm. He was also aware of the wage determination of 60 cents to 68 cents per hour as the minimum wage applicable to the housing project.
(d) Representatives of Masdelco informed Mr. Black that wage rates for Filipinos[30] supplied by it to the Navy under the Marianas Labor Services Contract began at 32 cents per hour, and that Masdelco provided subsistence and other perquisites without charge (i.e., without deduction from wages).
Consultation with representatives of Masdelco confirmed Mr. Black’s belief that Filipino workmen could be recruited in sufficient numbers on offer of the minimum requirements of the Embassy Agreement, i.e., the going wage rate in the Philippines plus the overseas differential of 25 percent, plus subsistence (food and lodging), plus fringe benefits (medical and dental care), and transportation.
(e) At the time of Mr. Black’s visit to Guam (around April 1,1958), the Hawaiian Dredging Company was in the final, cleanup stages of the transition of its construction payrolls into coverage by the FLSA. The information provided by representatives of Hawaiian Dredging to Mr. Black was therefore somewhat of a jumble of wage rates before and after FLSA. Mr. Black found it confusing. His efforts to obtain elucidation were, from his standpoint, unavailing.[31] He therefore decided to disregard all information obtained from that source.
Mr. Black did learn from Hawaiian Dredging of its adaptation of FLSA rates in terms of 60 cents cash wages and 40 cents (deductible from the $1 minimum) for perquisites. He considered this information useful in terms of the Navy project on which he intended to bid, since that project was subject to the FLSA. He did not consider it pertinent to *328 the Capehart project of the Air Force, which was not subject to the FLS A.
He also learned from Hawaiian Dredging that prior to November 1957 it had paid Filipino laborers wage rates as low as 36.5 cents per hour and had furnished subsistence and other perquisites to such employees without charge (i.e., without deduction).
(f) For further information Mr. Black turned to the Armed Forces. He attended conferences on Government work conducted by the Navy and by the Air Force. Officials of the Air Force informed him that their minimum wage rate for Filipinos was 52 cents per hour, from which they deducted 13 cents per hour for perquisites, leaving a net hourly cash wage of 39 cents.[32]
12. (a) The joint venturers had authorized Mr. Black’s firm, E. E. Black, Ltd., to prepare and submit the bid on the contract in suit. The Black firm maintained a complex cost accounting system (using cost data processing machines) through which it derived unit costs, e.g., costs per square foot of concrete or per lineal foot of pipe in place. One of the ingredients of unit cost was, of course, the cost of labor; the cost of labor involved wage rates and time; and time involved efficiency.
(b) Unit costs current in the Black firm’s office in Honolulu were predicated on the use of Hawaiian labor. As an approach to the preparation of the joint venture bid on the contract in suit, Mr. Black’s first step was to relate the cost of Filipino labor on Guam to the cost of similar labor in Hawaii. It was apparent that the cost of Filipino labor on Guam would include several ingredients, viz, the costs of recruitment in the Philippines, of transportation to and from Guam, of cash (take-home) wages, of subsistence, of transportation to and from the job each day, and of fringe benefits (medical, dental, etc.).
(c) Li his conferences with employers on Guam, Mr. Black had received estimates of the efficiency of Filipino labor ranging from 20 to 75 percent of the efficiency of *329 other labor. His own conclusion was that Filipino efficiency would likely prove to be from 30 to 45 percent of the efficiency of Hawaiian labor.[33]
(d) Upon his return to Honolulu, Mr. Black blended all elements (of cost and efficiency) together, and concluded that the employment of Filipino labor at wage rates of 60 to 68 cents per hour (from which the cost of perquisites was to be deducted) would in the final analysis be quite comparable in cost to the employment of Hawaiian labor.[34] He therefore directed the preparation of the joint venture bid on the basis of unit cost data then current in his Honolulu office.
13. (a) The Invitation for Bids[35] on the contract in suit[36] was issued on March 31, 1958,[37] by the Department of the Air Force. The “total” project was described as Armed Services Housing Project, consisting of 1,050 housing units covered by nine mortgages to be constructed at Andersen Air Force Base, Guam, M. I.
(b) The Invitation for Bids cited as authorization for the project Title IY of the Housing Amendments of 1955.[38] This is the so-called Capehart Housing Act.[39] For convenience of reference there is set forth herein (immediately *330 below) the very succinct statement of the operation of the Act heretofore approved by the court in two decisions.[40]
“3h essence, that Act is designed to provide housing for armed services personnel without the use of appropriated funds. To accomplish this objective, the Act provides for construction of housing projects on Government-owned property, pursuant to competitive bidding by private builders using private mortgage financing insured by the Federal Housing Administration (FHA) and guaranteed by the Military Departments. When the project is completed, the Department is responsible for amortizing the mortgage debt, including the payment of interest thereon, by the use of annual military appropriations for quarters allowances of service personnel. The Department is also responsible for maintenance and operation of the project after completion.
“The procedure for carrying out the statutory design is as follows: The Department issues invitations to bid. When bids are received, the Department, after consultation with the FHA, determines who has submitted the lowest acceptable proposal and issues to that bidder (who is referred to as the ‘eligible builder’), a ‘Letter of Acceptability.’ This Letter requires the eligible builder to take four actions: First, he must organize a Delaware corporation which is referred to as the ‘mortgagor-builder’; second, he must make arrangements with an acceptable mortgage lender for financing the total cost of the project, including profit; third, he must cause the mortgage lender to obtain an FHA commitment for insurance ; fourth, he must execute a three-party Housing Contract which defines the rights and obligations of the Department, the eligible builder, and the mortgagor-builder. The Letter of Acceptability also requires the Department to execute a lease of a project-site to the mortgagor-builder.
“Once the foregoing arrangements are made, the parties in interest effect a ‘closing’ at which the mortgagor-builder delivers to the mortgagee a note, together with a mortgage securing the same, which bears a prescribed rate of interest. The eligible builder deposits in escrow with the mortgagee *331 tbe capital 'stock of the newly formed mortgagor-builder corporation for ultimate delivery to the Department, and delivers to the Department certified checks covering the cost of design, supervision, administration, and inspection of the project.
“Thereafter, pursuant to the Housing Contract, the eligible builder causes the project to be constructed and is paid therefor entirely out of mortgage proceeds. All profits under the Housing Contract accrue to the eligible builder. As construction progresses individual housing units are placed under control of the Department. Determination as to completion of the project is made by the FHA which then issues a final endorsement of the mortgage note for mortgage insurance. When the project is completed, the capital stock of the mortgagor-builder is delivered to the Department by the mortgagee as escrow agent, and payment of the mortgage indebtedness of the mortgagor-builder is undertaken by the Department.”
(c) The Invitation for Bids contained the following provisions:
(1) 2. Sealed bids (in triplicate) for the construction through FHA insured mortgage financing of the above described total housing project, including the furnishing of all necessary labor, equipment and materials and the performing of all work, services and arrangements, in strict accordance with the terms of a Letter of Acceptability and a Housing Contract, specimen forms of each being attached hereto, will be received at Bldg. 102, Maywood Air Force Depot, Atlantic & Vandine Boulevards, Maywood, California (Los Angeles vicinity) until 2:00 P.M. PST on 13 May 1958.
_ (2) 4. The bidder should carefully examine the provisions of the form of the Housing Contract attached hereto, including the Drawings and Specifications made a part thereof; visit the site of the Housing Project; and fully inform himself as to all conditions and matters which can in any manner affect the financing of the construction and the constructing of the housing projects or their cost. Should the bidder find discrepancies in, or omissions from, such Drawings and Specifications or other documents attached hereto, or should he be in doubt as to their meaning, he should at once *332 notify the Contracting Officer, Olfutt Air Force Base, Nebraska and obtain clarification prior to submitting a bid. Information given will be transmitted to all known interested bidders.
(3) 5. Under the provisions of Title IV of the Housing Amendments of 1955, as amended, the. total principle [sic] amount of the mortgages is limited, among other things to the amount of the bid of the eligible builder. However, Section 212(a) of the National Housing Act as amended requires that wages paid to laborers and mechanics be the prevailing wage as determined by the Secretary of Labor not more than ninety (90) days prior to the commencement of construction. Since more than ninety (90) days may elapse from the date of this Invitation for Bids to the commencement of construction, the bids called for by this Invitation for Bids will include a provision for adjustment of the dollar amount therein specified to reflect any difference between the tentative minimum wage schedule attached hereto and the applicable minimum wage schedule as finally determined by the Secretary of Labor. Any such adjustment will be in an amount determined by the Commissioner to reflect such differences, and the amount of the lowest acceptable bid and the FHA estimated total replacement cost of the projects will be amended in the amount so determined by the Commissioner; except that, if such an adjustment would increase the amount of the bid above the amount of any other statutory maximum applicable to the insurable mortgages, the eligible builder will have the option of reducing his bid to such statutory maximum or of withdrawing his bid.
(4) 11. The dollar amount of the acceptable bid will be divided, for mortgage purposes, in the same proportion as the FHA total estimated replacement cost for each property or project as shown in each of the 9 Final Appraisal and Eligibility Statements issued by the Federal Housing Commissioner, copies of each being attached hereto for your information.
(5) 24. Bidders are further advised that the Blousing Contract will also be subject to certain other statutory provisions with respect to labor and other matters as shown in the specimen form of Housing Contract.
(d) Attached to the Invitation for Bids was a copy of Wage Decision S-9589, described in finding 10(d).
*333 14. The contract (a specimen copy of which, was attached to the Invitation for Bids) contained the following provisions :
(a) From “Article XI, Section 212(a) of the National Housing Act”:
(16) The eligible builder (1) understands that the wages to be paid laborers and mechanics employed in the construction of the projects, whether or not such laborers and mechanics are employed directly by the eligible builder or by a subcontractor in the construction of the projects, are required by the provisions of Section 212(a) of the National Housing Act, as amended, to be not less than the wages prevailing in the locality in which the work was performed for corresponding classes of laborers and mechanics employed on construction of a similar character, as determined by the Secretary of Labor with respect to the projects, and (2) hereby states that he has read the aforesaid determination by the Secretary of Labor and is fully familiar with same.
(b) From “General Provisions, Housing Contract”:
26. Prevailing Wage Determination (Title IY of the Housing Amendments of 1955 as Amended).
(a) All mechanics and laborers employed or working directly upon the site of the work will be paid unconditionally and not less often than once a week, and without subsequent deduction or rebate on any account (except such payroll deductions as are permitted by the Copeland Act (Anti-Kickback) Regulations (29 CFE, Part 3) the full amounts due at time of payment, computed at wage rates not less than those contained in the “prevailing wage determination” of the Secretary of Labor which is defined in this Housing Contract, regardless of any contractual relationship which may be alleged to exist between the eligible builder or subcontractor and such laborers and mechanics; and a copy of the prevailing wage determination shall be kept posted by the eligible builder at the site of the work in a prominent place where it can be easily seen by the workers.
(c) From “General Provisions, Housing Contract”:
27. Eight-Hour Laws — Overtime Compensation.
No laborer or mechanic doing any part of the work contemplated by this Housing Contract, in the employ of the eligible builder or any subcontractor contracting for any part of said work contemplated, shall be required or *334 permitted to work more than eight hours in any. one calendar day npon such work, except upon the condition that compensation is paid to such laborer or mechanic in accordance with the provisions of this clause. The wages of every laborer and mechanic employed by the eligible builder or any subcontractor engaged in the performance of this Housing Contract shall be computed on a basic day rate of eight hours per day and work in excess, of eight hours per day is permitted only upon the condition that every such laborer and mechanic shall be compensated for all hours worked in excess of eight hours per day at not less than one and one-half times the basic rate of pay. * * *
(d) From “General Provisions, Housing Contract”:
30. Copeland (Anti-Kickback) Act — Nonrebate of Wages.
Hie regulations of the Secretary of Labor applicable to contractors and subcontractors (29 CFR, Part 3), made pursuant to the Copeland Act, as amended (40 U.S.C. 276c), and to aid in the enforcement of the Anti-Kickback Act (18 U.S.C. 874) are made a part of this Housing Contract by reference. The eligible builder will comply with these regulations and any amendments or modifications thereof and the eligible builder will be responsible for the submission of affidavits required of subcontractors thereunder. The foregoing shall apply except as the Secretary of Labor may specifically provide for reasonable limitations, variations, tolerances and exemptions.
15. On May 26, 1958, plaintiff submitted its bid, which contained the following statement:
The bidder represents that he is aware of the statutory requirements of Section 212(a) of the National Housing Act, as amended, that wages to be paid to laborers and mechanics employed in the construction of the projects are required to be not less than those contained in the prevailing wage determination of the Secretary of Labor, and that, in order to comply with these statutory provisions, the bid price is subject to increase or decrease by an amount determined by the Federal Housing Commissioner (hereinafter called the “Commissioner”) to represent the difference in the “Total Estimate of Replacement Cost of the Total Project,” computed according to the wage schedule attached to the Invitation for Bids and computed according to the wage schedule as amended by the “Prevailing Wage Determination” as that term is *335 defined in Paragraph 19 of the specimen form of Housing Contract attached to the Invitation for Bids. Moreover, the Bidder realizes that, if the amount of his bid as specified in the Letter of Acceptability, is thereby increased so as to exceed the maximum total amount of the insurable mortgages as determined by the Commissioner, the bidder shall have the option of reducing his bid to the amount of the maximum total insurable mortgages as determined by the Commissioner, or of withdrawing his bid.
18. (a) On June 13, 1958, the Navy entered into a new contract with Masdelco for “miscellaneous labor services” for fiscal 1958 (replacing the earlier Labor Services Contract[41]) whereby wage rates of 89 cents and 68 cents were established for the two lowest levels, H and I, without provision for increases above step 1. There is no evidence to indicate that plaintiff had any knowledge of this new contract.
(b) On June 23,1958, the Department of Labor[42] notified Masdelco of its determinations (effective July 1 to cover fiscal 1958) of “the reasonable cost of board, lodging and medical care furnished to * * * Filipino employees.” For employees “receiving standard board and lodging,” the cost was found to be $12 per week (30 cents per hour); for employees “receiving standard board and special housing,” the cost was found to be $13.28 per week (33.2 cents per hour) ; and for employees “receiving special housing and special * * * board,” the cost was found to be $14.36 per week (35.9 cents per hour). There is no evidence to indicate that plaintiff was advised or knew of these determinations.
17. (a) Meanwhile, on June 16,1958, the Letter of Acceptability was forwarded to plaintiff by the Air Force. This document obligated plaintiff to prepare for and consummate the closing, scheduled for August 29,1958. It likewise obligated the Department.
(b) On June 18, 1958, the Air Force made application to the Department of Labor for a new wage determination applicable to the contract work, the former determination (S-9589) having expired on May 27,1958.
*336 (c) The Letter of Acceptability required plaintiff to—
* * * Make application through the Contracting Officer, Andersen Air Force Base, to the Secretary of Labor for an appropriate wage determination * * * for use in the construction of the project, and furnish a copy of such wage determination to the Contracting Officer and the Commissioner. Such wage determination will be used by the Commissioner to increase or decrease the bid price in the manner specified in your bid.
(d) On June 27, 1958, plaintiff wrote to the contracting officer:
Under * * * the Letter of Acceptability * * * we are required to make application through your office to the Secretary of Labor for an appropriate wage determination for use in the construction of the project.
We understand that the Fair Labor Standards Act was made applicable to contract labor on Guam in November 1957, which may have been subsequent to the date of analysis of the Guam labor rates which are set forth in Decision S-9589. In the Invitation to Bid, the wage determination S-9589 did not clarify the amount of allowance for transportation, quarters and subsistence of laborers and mechanics.
With the possibility that wage rates may have increased on Guam, we would like to request an appropriate wage determination from the Secretary of Labor and a clarification of such rates as to the allowance for transportation, quarters and subsistence.
* * * * ‡
(e)On July 9, 1958, the contracting officer replied:
‡ ‡ ^
Action has been initiated by this command to obtain an appropriate wage determination for use on this proposed contract.
The Fair Labor Standards Act, as amended to cover Guam and Wake Island, does not cover this project. * * *
In reference to clarification of such rates as to the allowance for transportation, quarters and subsistence, I can only state that the applicable wage rates plus the Embassy Agreement are the two documents that will furnish you the necessary clarification. A copy of a Brochure on Guam, which includes a copy of the Embassy Agreement, is * * * enclosed for your information and guidance.
*337 (f) On July 16, 1958, the Department of Labor issued Wage Decision S-25,245, effective on date of issue, and expiring on October 15, 1958. All categories and rates in Wage Decision S-25,245 were identical with the categories and rates set forth in Wage Decision S-9589.
(g) On July 24, 1958, the Air Force forwarded a copy of Wage Decision S-25,245 to plaintiff, with the advice that “A copy of the determination has been forwarded directly to the FHA Director, Honolulu * * * and should be used by that office to calculate any increase or decrease in the bid amount shown in the Letter of Acceptability.”
(h) The Air Force made the application mentioned in paragraph (b) of this finding before plaintiff transmitted its request to the Air Force. The Department of Labor issued its determination in response to the Air Force application. There is no evidence to indicate that the Air Force transmitted plaintiff’s request (asking for clarification) to the Department of Labor, or that the Department of Labor ever knew of plaintiff’s request for clarification.
18. (a) On July 8,1958 (which was after the issuance of the Letter of Acceptability but before the issuance of Wage Decision S-25,245), Mr. Black wrote to Masdelco (Guam) enclosing a copy of Wage Decision S-9589, saying:
* * * The Air Force is currently obtaining a new wage determination as * * * the one enclosed expired on 27 May. As the Davis-Bacon Act applies to this contract, such a determination should represent present wage standards for Guam. It has been represented to me that the wage determination enclosed includes all wage items, including recruitment, air transportation and subsistence. Although the F.L.S.A. does not apply to our project, our wage determination should coincide with going rates in Guam, and I believe the enclosed rates to be significantly below present Guam pay scales.
The letter further requested Masdelco—
* * * to return the attached wage schedule marked with current Guam wage scales for each of the classifications, showing, if possible, cash wages and withholdings for subsistence, etc.
*338 and to advise—
* * * whether it would be possible to obtain qualified tradesmen in the Philippines to work on Guam at the total wage rates listed on the enclosure. * * *
(b) On July 12,1958, Masdelco replied:
Hi * H* * *
* * * we are not in a position to quote * * * [current Guam wage rates of employee categories as listed by you] because we do not know qualification requirements, etc. for these particular categories. However, attached hereto is our current “mmirrm/m wage” {FLSA) wage schedule which you can use as a tentative guide. We realize that this is not very satisfactory but hope it will be of some help. To elaborate on these rates, they are based on US Dept, of Labor fringe benefit value determinations of 39 cents per hour for Levels A and B and 32 cents per hour for Levels C to I inclusive. These hourly fringe benefit values are projected to a 40 hour week or $15.60 per week for Levels A and B and $12.80 per week for Levels C to I. The wage rates shown are actual cash wages which in effect means that the employee receives compensation in two forms, i.e. cash and per-fuisites. Using the basic minimum wage requirement of 1.00 per hour as an example, our lowest paid man (Level I) is paid as follows:
Cash Wages_ 68 cents per hour
Fringe Benefits (Food, Housing, Medical, Entertainment, etc.)_ 32 cents per hour
Total_$1. 00 (Minimum Wage)
Referring to your second query re availability of qualified tradesmen in the Philippines to work on Guam at your rates, we have written to our Manila principals and will forward the information on to you as soon as received. “Off the record” we venture to say that if your listed rates are “cash wages” the possibilities are good that you can be supplied this labor. However, your statement indicating that the listed wage determinations include all items including recruitment, air transportation etc. is slightly confusing. However, I am sure we can discuss this further and work out rates etc. to mutual satisfaction.
*339 (c) On August 7,1958, Mr. Black again wrote to Masdelco:
* * * we have requested you to perform the following services for us when we are awarded the contract for this project:—
1. Recruit approximately one thousand Filipinos Contract Laborers in Manila.
2. Secure interim clearances for these men thru Commander Naval Forces Marianas or Commander Naval Forces Philippines. * * * We agree to post the required bond to guarantee repatriation of unacceptable security risks.
3. Furnish quarters, subsistence, medical and dental services and laundry facilities as required by the U.S.A. Embassy Agreement with the Republic of the Philippines dated May 13, 1947, at Camp Roxas, Guam, M.I.
* * * we are the eligible bidder on the * * * project. We expect to execute the necessary documents * * * and be awarded the contract on or about August 29, 1958. When we have been awarded this contract we will execute an agreement with you to perform the above stated services.
(d) On August 8, 1958, Masdelco (Guam) forwarded to Mr. Black a copy of a letter directed to it on August 5,1958, by Masdelco (Philippines), which contained the following advice:
Today, we again conferred with Commissioner Castillo concerning the appointment of masdelco (Phil.) as recruiting agent, the wage scale applicable to Filipino mechanics and laborers and the Decision of the U.S. Secretary of Labor on the aforementioned wage scale. He advised us that he has referred this matter to the Philippines Department of Foreign Affairs which in turn has written the Philippines Ambassador to Washington, D.C. requesting the latter to make representations with the U.S. Departments concerned in regard to the Wage Scale and the Decision, with the end in view of raising the wage scale up to the level provided under the U.S. Fair Labor Standards Act.
We have explained to Commissioner Castillo that the decision of the U.S. Secretary of Labor fixing the wage scale of Filipino laborers and mechanics was based on the Davis-Bacon Act, as amended, and National Housing Act as amended. We have read these two Acts and while the provision of the National Housing Act to the effect that the wages to be paid the laborers and mechanics shall be not less than the wages prevailing in the locality in *340 which the work was performed for the corresponding classes of laborers and mechanics employed on construction of similar character, as determined by the Secretary of Labor prior to the beginning of the construction, is made applicable to Guam and the Marianas Islandswe note that the Davis-Bacon Act which contains a similar provision seems to be limited in application to the Geographical limits of the States of the Union, the Territory of Alaska, the Territory of Plawaii or the District of Columbia (Guam and the Marianas Islands were not included). We are passing along this problem, to your goodself in the belief that you are in a better position to determine whether or not the Davis-Bacon Act is applicable to Guam and the Marianas Islands.
In closing, Commissioner Castillo advised us informally that we can start listing applicants for work with E. E. Black & Co., although he stated that he would not release his formal approval of our recruitment agency contract, wage scale and individual employment contracts pending receipt of advice from the Philippines Ambassador at Washington, D.C.
(e) On August 15, 1958, Mr. Black replied to the foregoing letter:
In regard to your letter of 8 August, we are concerned over the final disposition of the representations of Commissioner Castillo to the Philippine Ambassador in Washington. Unless he gives formal approval of our wage scale, we cannot sign a contract with the Air Force. In order to complete this matter we have requested our Washington attorney * * * to check with the Labc~r Department and advise us what transpires. In addition we have advised the Air Force in Washington an4 Guam of the action of Commissioner Castillo, and requested that they assist in obtaining a final disposition of this matter. Any redetermination of wages by the Labor Department would involve considerable delay in our signing a contract; consequently, we are anxious that the matter be resolved with the present wage determination.
(f) On August 26,1958, Masdelco (Philippines) wrote to Commissioner Castillo:
In behalf of E. E. Black & Co., Ltd., we respectfully submit for your consideration and approval the attached Bate of Wages of laborers and mechanics who might be recruited to work for E. E. Black & Co., Ltd., successful bidders in a contract for construction of a family hous *341 ing project at Andersen Air Force Base, Guam. There is likewise attached herewith a copy of Wage Determination, Decision No. S-25245 dated July 16, 1958 of the United States Secretary of Labor as required by law and applicable to the work described on the attached Rate of Wages.
E. E. Black & Co., Ltd. desires to employ Filipino laborers and mechanics in its construction project on Guam and in that connection would highly appreciate your approval of the attached Rate of Wages. Please note that the attached Decision of the United States Secretary of Labor is the latest Wage Determination made by that office as required by law and should be considered as the prevailing Rate of Wages for the described classes of labor in Guam.
Your usual prompt attention in this matter is earnestly requested in order that preparations may be made to interview and classify Filipino laborers and mechanics who will be needed to ivork in the above-mentioned Guam project.
(g) On August 26,1958, Commissioner Castillo[43] replied:
This is to acknowledge receipt of your letter of even date requesting approval of the Rate of Wages of Laborers and mechanics attached thereto, in connection with the attached copy of Wage Determination, Decision No. 8-25245 [sic] dated July 16, 1958 if [sic] the United States Secretary of Labor applicable thereto.
We observe that the Rate of Wages referred to is lower than the rate provided for in the Fair Labor Standards Act of 1938, as amended. However, in view of your request for urgent action on our part, we have recommended to the Secretary of Labor the temporary acceptance of the above-mentioned Wage Determination, Decision, without prejudice to further amendments as a result of the negotiations between the Philippine and the American governments on the issue.
In view hereof, the Rate of Wages submitted by you is hereby approved subject to the condition stated m the last preceding paragraph.
(h) Masdelco. (Philippines) promptly informed Masdelco-(Guam) and the latter cabled Mr. Black: ■
Manila informs Commissioner Castillo released written approval rate of wages today.
*342 (i) On September 11,1958, Mr. D. S. Lennox, Vice President of E. E. Black, Ltd. (then on Guam in behalf of plaintiff) , wrote to Masdelco (Guam):
Enclosed are five copies of the Petition For Permission To Import Nonimmigrant Aliens, Form I-129B and ten copies of the Contract of Employment. This contract of employment is patterned after your contract of employment with the exception of Article No. 1, as our job does not come under the Fair Labor Standards Act of 1938 but does come under the Federal Housing Act, Davis-Bacon Act, and the Copeland Act, we cannot value living quarters, food and soforth as a prerequisite in determining wages. We will have to pay our employees weekly the wage as determined under the Secretary of Labor Wage Determination of which we have already given you a copy. We will then have to deduct from their wages the value of the prerequisite [sic], which we furnish them, with their consent and also the consent of the Secretary of Labor.
I have suggested to our attornies that possibly we should include the following wording in the contract as a note to the amount to be charged weekly to each employee: — “This is the same value that the Wage and Hour Division of the United States Department of Labor has placed on these prerequisites for purposes of the Fair Labor Standards Act of 1938 as amended.”
Enclosed is a copy of a letter which our attornies have forwarded to our correspondent in Washington to be filed with the United States Department of Labor requesting permission to deduct from the wages of our employees a reasonable cost of the prerequisite which we are going to furnish them. When we have received permission from the Secretary of Labor to make this deduction, we will then have the attornies prepare a form for the signature of each employee authorizing us to deduct from their weekly pay a reasonable cost of the prerequisite furnished to them.
*****
19. (a) Meanwhile, on September 9, 1958, the Philippine Embassy in Washington transmitted to the Department of State the following note:
The Ambassador of the Philippines presents his compliments to His Excellency the Secretary of State and has the honor to refer to the proposed scale of wages determined by the Secretary of Labor for the workers *343 recruited for tlie construction of the Andersen Air Force Base at Guam.
Since the scale of wages referred to is much below the minimum wage provided in the Fair Labor Standards Act, as amended, the Ambassador of the Philippines has been directed to request for the reconsideration of the decision of the Secretary of Labor, inasmuch as this would be applied to a large number of Filipino workers to be recruited in the Philippines.
The reaffirmation in the last amendment to the Fair Labor Standards Act of the application of that Act to Guam has been interpreted hi the Philippines as extending the benefits of that Act to all Filipino workers in that island. Consequently, the determination of the Secretary of Labor referred to is considered as constituting a backward step against the interests of the Filipino workers in Guam.
In view of the fact that the application for recruitment of Filipino workers is now pending in the Philippines, the Ambassador of the Philippines would appreciate it if His Excellency could bring this matter up to the attention of the Secretary of Labor for early reconsideration of his determination referred to.
(b) As prelude and postscript to the Philippine Embassy note, the Philippine Embassy had made informal inquiry of the Department of State in August, concerning the wage determination, and the Department of State had inquired of the Department of Labor. Following customary practices, meetings had been held, attended by lower echelon officials of both Governments.
(c) These conferences revealed (1) that the Philippine representatives were unaware of either the “commerce” base of the FLSA or the distinction between that Act and the Davis-Bacon Act; and (2) that the Department of Labor, in making the wage determination, had intended the 60-cent wage to be paid in cash and to be supplemented by subsistence valued at 40 cents, making the total wage $1 per hour.
(d) The Philippine representatives were fully satisfied with the explanation.
(e) Plaintiff was not informed of these inter-Government meetings or exchanges until after the fact.[44]
*344 (f) The formal reply of the Department of State, transmitted on October 15, 1958, follows:
The Secretary of State presents his compliments to His Excellency the Ambassador of the Philippines and has the honor to acknowledge the receipt of his note dated September 9, 1958 requesting a redetermination of the scale of wages proposed by the Secretary of Labor for the workers recruited for construction work on Andersen Air Force Base on Guam.
The Ambassador’s request was discussed with representatives of the Department of Labor. Since the Department of Labor has determined that wage rates on the Andersen project shall be fixed according, to the Davis-Bacon rules as applicable under the National Housing Act, the Secretary of Labor made a redetermination under the Davis-Bacon Act of the prevailing minimum wage rates for various categories of workers to be employed in the construction work on Andersen Air Force Base. These rates range from $1.00 to $1.08 per hour and are shown in the enclosed copy of the decision made by the Secretary of Labor which supersedes the previous determination.
20. (a) Representatives of plaintiff and defendant began the closing conferences in Washington on or about September 8, 1958.[45]
(b) By letter dated September 15, 1958, signed by Mr. Black, plaintiff made application to the Department of Labor—
* * * under the provisions of 29 C.F.R., Sec. 3.5 to make payroll deductions from wages paid to employees on the * * * project * * * for the reasonable cost of living quarters, food, hospitalization, and medicine and medical care.
(c) The letter was submitted in person to Mr. James R. Beaird, the Assistant Solicitor of Labor in charge of the Division of Wage Determination. He was surprised to receive such an application, and responded by saying that he would give his answer the next day. While he did not express himself to plaintiff at the time, he testified at the trial that he had thought the application was not made in good faith.[46]
*345 (d) On September 16,1958, Mr. Beaird met with personnel of the Department of Labor and the Air Force to consider plaintiff’s request. The conferees debated-whether to issue a new wage determination or merely to deny the request.[47] They decided that the wage determination needed clarification. Mr. Beaird thereupon decided to issue a new decision superseding Wage Decision S-25,245.[48]
(e) On September 17, 1958, Mr. Beaird gave his reply in the following letter addressed to the Air Force,[49] a copy of which was supplied to plaintiff:
There is attached a redetermination of wage minimum applicable to the construction of 1050 family housing units at Andersen Air Force Base, Territory of Guam.
This redetermination is issued in order to clarify the wage mínimums specified in wage determination S-25,245, and to reflect, on the basis of available data, the straight time hourly wages, actually received by the .various classifications of laborers and mechanics on projects similar in character to the proposed contract work on Guam. As you know, the minimum specified in wage determination S-25,245 reflected only cash payments received by workers and did not include the reasonable value of certain non-cash payments which they received. Therefore, in order to clarify the matter, it is necessary to amend this determination torreflect [sic] the total straight time wage paid for work performed.
It should be noted, in connection with this matter, that consideration will be given to an application by the successful bidder to make appropriate deductions for the reasonable value of such non-cash payments under the Department’s Regulations, Part 3 (29 CFR, Subtitle A). $ $ $ * $
(f) The “redetermination” was in the form of Wage Decision T-5369, bearing date of'September 17, 1958, super *346 seding Decision S-25,245 of July 16, 1958. In Decision T— 5369, wage rates of $1 to $1.08 replaced the former wage rates of 60 cents to 68 cents.
(g) On September 18,1958, plaintiff’s attorney addressed the following letter to the Air Force:[50]
In view of the fact that yesterday, September IT, 1958, the United States Department of Labor issued a wage determination, Decision No. T-5369, on wage rates for work in Guam at a time when we were in the process of closing the above contract, I request a reasonable time to review the legal problem involved, namely, whether in view of this redetermination the contractors are entitled to an increase in price so that I can properly advise them of their legal rights.
I request that the matter of closing be postponed until Monday, 10 a.m., at which time I will give you an answer — whether the contractors will close without renegotiation of the contract price.
(h) On September 19, 1958, the Air Force replied:
$ $ ‡ $
You and your clients were advised on the afternoon of September IT, 1958, that the Air Force had made the determination, after consultation with the Director of the Federal Housing Administration, that the price in the Housing Contract would not be increased and that the contractor could proceed with the closing or be considered in default of the terms of the Letter of Acceptability, dated June 16,1958. Your attention is invited to the terms of the Letter of Acceptability and particularly paragraph T. Further delay for the purpose of renegotiation of the contract price will not be acceptable.
You are advised that your client must resolve any problem they may have, and proceed with the closing by not later than 10:00 A.M. on Monday, September 22, 1958, and complete the closing prior to the close of business on Tuesday, September 23, 1958, or they will be considered in default.
(i) As of this time, plaintiff had expended more than $200,000 in preparation for the closing, in addition to its deposit of $25,000 as bid security.
*347 (j) On September 22, 1958, plaintiff’s attorney addressed the following letter to the Air Force,[51] with a copy to FUA:[52]
This will acknowledge your letter of September 19, 1958, advising us that the Air Force had made the determination that the price in the housing contract would not be increased despite the new wage determination (Decision No. T-5369) of the Secretary of Labor, dated September 17,1958, and delivered to us on the same date.
Under the terms of the invitation for bids our client’s bid and the letter of acceptability, since the new wage determination which substantially increases the hourly rates of labor, we are entitled, under the terms of these instruments, to an increase in the contract price. However, in view of your letter directing us to proceed or, in the alternative, be declared in default, we will proceed to close with full reservations of our rights under our ■bid and letter of acceptability and advise you that we will make appropriate claim for an adjustment in the contract price.
* * * * #
(k) By letter dated September 22, 1958, the Air Force advised plaintiff, in response to plaintiff’s request for the information, that the Air Force considered the effective date of the contract in suit to be September 8, 1958.[53]
21. (a) Plaintiff proceeded with the contract work accordingly. It paid the wage rates specified in Decision T-5369, subject to deductions for perquisites determined and allowed as hereinafter reported. Overtime was computed on the total wage rates of $1 to $1.08, with hourly rates of $1.50 to $1.62 for overtime.[54]
(b) Performance of the contract was substantially completed on or about July 14, 1960. The total contract price, including all changes, was $20,385,701, and has been paid to plaintiff.
*348 . 22. (a) On October 9,1958, the Solicitor of Labor replied to plaintiff’s request of September 15 for. approval of payroll deductions:
* * * The proposed deductions are for living quarters, food and hospitalization (including medicine and medical care).
Your request indicates that the proposed deductions are not prohibited by other law; that such deductions are voluntarily consented to by each employee in writing and in advance of the period in which the work is done; that consent to the deductions is not a condition either for the obtaining of or for the continuance of employment; that the convenience and interest of the employees are served thereby, and that such or similar deductions have been customary in this or comparable situations; that the contractor, subcontractor or any affiliated person does not make a profit or benefit directly or indirectly from the deductions.
On the 'basis of the representations made, permission is granted * * * to deduct an amount up to $10.05 per week from each employee for the items enumerated above. If, after the project has commenced, this sum is shown to be inadequate for furnishing the services to which the deductions will be applied, consideration will be given to the granting of permission to make increased deductions upon proper showing that such increases are necessary to coyer the cost of the services.
(b) Plaintiff promptly protested the allowance of $10.05 per week (25.15 cents per hour) as inadequate, and requested an increase. On December 23, 1958, the Solicitor of Labor advised plaintiff’s Washington attorney:
* * * Your letter requests permission under the Copeland Act Regulations * * * to make payroll deductions of 32 cents per straight-time hour, or $12.80 per 40-hour week from the wages of * * * employees * * * for quar-. ters, transportation and medical and dental care. My letter of October. 9, 1958, granted permission to the contracting firm to make deductions óf $10.05 per week for the purposes stated, but you'affirm that this amount is not sufficient to defray the costs of the services mentioned.
On the basis of the representations made in your letter and enclosures, permission is granted * * * to make the deductions of 32 cents per straight-time hour, or $12.80 per 40-hour week, under Section 3.5(b), subject to the provisions of Section 3.5 (c) of the Regulations.
*349 (c) Pursuant to the revised allowance of $12.80 per week (32 cents per hour), plaintiff paid to the affected employees cash wages of 68 to Y6 cents per hour for straight time. Plaintiff also paid $1.50 to $1.62 per hour for overtime.[55]
(d) The Department of Labor and the Air Force have consistently held to the position that the redeterminátion of wage rates by Decision T-5369 did not result in any increase over the wage rates that would have been payable under Decision S-25,245 if the redetermination had never been issued.[56]
(e) While plaintiff considered (until the commissioner’s report) the point subordinate to its case as a whole,[57] it does maintain that failure by the Government to recognize and adhere to the 40-cent deduction for the cost of perquisites resulted in an increase in straight time wages of 8 cents per hour (the difference between 40 cents and 32 cents) and in overtime wages of 60 cents per hour.[58]
(f) When the Department of Labor was confronted with plaintiff’s request of September 15,1958, for determination of an allowable deduction for the cost of perquisites, the Department, instead of issuing its “redetermination” of $1 to $1.08 per hour, could have simply denied the request, adding (if it chose) a terse announcement that the 60-68 cents scale in Decision S-25,245 represented cash wages. Plaintiff would then have had to pay those rates in cash or face enforcement *350 proceedings. Under such circumstances, plaintiff could have (1) paid the 60-68 cents in cash and (2) provided perquisites in addition at its own expense.[59] If the perquisites had cost plaintiff 32 cents per hour, the total wages would have been 92 cents to $1 per hour instead of $1 to $1.08.
(g) The wages paid by plaintiff to its Filipino employees under Wage Decision T-5369 were 8 cents per hour higher (for straight time) than the wages required by either Wage Decision S-9589 or S-25,245 and 12 cents per hour (for overtime).
(h) Under all of the circumstances of the case, payment of these additional wages is deemed to be an increase in wages resulting from the issuance of Decision T-5369.
23. (a) Diligent efforts were made by plaintiff to obtain administrative relief from what it considered to be the effects of Decision T-5369, to no avail.[60] On October 3,1958, plaintiff’s attorney forwarded a detailed statement of the claim to the contracting officer (Air Force) with copies to Mr. Tim Yee, FHA Director in Honolulu.[61]
(b) The contracting officer (Air Force) passed the claim on to FHA (Mr. Yee) and replied to plaintiff’s attorney on November 18,1958, by sending him a copy of Mr. Yee’s opinion, which contained the following:
In reply to your letter of October 13, 1958 regarding a claim against the Government for the difference between the minimum wage schedule Nr. S-9589 attached *351 to the Invitation for Bids and the final Wage Determination Nr. T-5369 dated September 17, 1958, please be advised: “* * * it is the opinion of this Administration that no increase in the dollar amount of the Housing Contract is warranted.”
The figures in the Wage Determination of July 16, 1958 for the Andersen Project represented cash wages only and did not include payments for certain non-cash items. The subsequent Wage Determination of September 17, 1958 included both cash and non-cash items.
It is our opinion that both Wage Determinations are comparables and one is merely supplementary to the other.
(c) The contracting officer’s letter to plaintiff’s attorney further advised:
*****
If you desire to process the claim further, request you transmit your desires to the undersigned Contracting Officer, who will prepare his findings and decisions.
In the latter case, request you supply this office with the following:
1. Your estimate of the total number of labor hours (of the type affected by this new wage rate) that you anticipate to be necessary to fullfill this contract.
2. The exact monetary amount of your claim.
(d) On December 10, 1958, plaintiff’s vice president and project manager in Guam wrote to the contracting officer (Air Force) protesting the FHA decision and requesting further processing of the claim by higher authority, saying:
*****
* * * there is nothing in the Wage Determinations of February 25, 1958 and July 16,1958, which indicates that the wage rates therein represent cash wages only and do not include non-cash perquisites.
We have estimated that 3,120,000 hours of straight time and 621,000 hours of overtime will be applied to this project on the basis of working six days per week of eight hours per day.
We therefore claim that the Wage Determination of September 17, 1958 has increased the labor cost of this contract by an estimated amount of $1,248,000 for straight time work and $374,400 for overtime work or a total of $1,622,400 based on the original information supplied with the Bid Documents and the Wage Determina *352 tion S-9589 of February 25,1958 which was a part of and included in thó Bid Documents.
* * * # ' *
Our bid was made on the basis of Wage Determination, Decision S-9589 of February 25,1958 and to this date we have had no notification that the scale of wages in Decision S-9589 were not the full and complete wages prevailing in the community where the subject project was to be constructed.
(e) Nine months later, on September 29, 1959, plaintiff’s Washington attorney submitted another detailed statement of the claim to the Secretary of the Air Force. On October 9, 1959, the Secretary of the Air Force wrote to the attorney:
We are in receipt of the information submitted with your letter of September 29, 1959, which we understand concludes the presentation of your client’s case. This information, together with the data you previously furnished to us, has been carefully considered by this office. In addition, we have independently assembled and reviewed pertinent information with respect to this claim. As you know, we have met on numerous occasions to discuss the problems involved.
We have concluded that the Air Force cannot properly recommend to the Federal Housing Commissioner an increase in the contract executed by your client, based upon alleged increases in the prevailing wage rates as determined by the Department of Labor. Notwithstanding its purported “reservation of rights,” the contractor is bound, in our opinion, to accept the terms contained in the formal contract to which it decided, with full knowledge of the pertinent facts to become a signatory. See, in this connection McCabe Construction Co. v. Utah Construction Co., 199 F. 976, and United States ex rel. International Contracting Co. v. Lamont, 155 U.S. 303. Moreover, we do not feel that the contractor has demonstrated that its bid was in fact based upon labor cost data which was inconsistent with the Labor Department’s September 17, 1958 clarification of its wage determination. For the same reasons as set forth above, we likewise cannot recommend favorably to the Federal Housing Commissioner your alternative proposal for an increase as outlined in your letter of September 29, 1959.
(f) On October 22, 1959, the same attorney wrote to the FHA Commissioner:
*353 The above-mentioned contract was executed in September, 1958, and immediately prior to closing the Labor Department issued a new prevailing wage determination adversely affecting the labor costs involved in its performance. The Contractor and the Air Force disagreed as to the right of the Contractor to a price adjustment. After fully reserving its right to such adjustment under the terms of the Invitation for Bids and its Bid, the contract was executed.
Since October 1958, the Contractor has been seeking an adjustment of the contract price. Under date or October 9, 1959, the Air Force, by letter addressed to me, advised the Contractor that it would not recommend to the Federal Housing Administration any adjustment in the contract price. Under the terms of the Invitation for Bids and the Bid the authority to decide the amount of the adjustment to which the Contractor is entitled is vested in you, as Federal Housing Commissioner.
There is attached hereto a Memorandum dated October 22,1959, with enclosures, which outlines the facts, the background and the Contractor’s position. It is respectfully requested that you make a determination that the Contractor is entitled to an adjustment in the contract price based upon the difference in estimated costs computed under the wage determination which was attached to the Invitation for Bids and under the final wage determination. It is further requested that the undersigned be afforded an opportunity to discuss this matter with you or your designated representative.
(g) On May 9, 1960, the FHA Commissioner replied:
The above matter, as you know, has been the subject of several conferences with various members of my staff, the Department of Labor and the Air Force during these past several months. We must finally conclude, however, as we did initially, that the FHA does not have the authority to settle the controversy here involved, nor, under the circumstances, do we have the authority to grant any relief to the parties in interest.
It appears that the September 17,1958, wage determination by the Department of Labor did result in a wage increase and that an increase in mortgage amount at that time was feasible. Whether or not such an increase was proper was a decision for the Air Force to make, and had they authorized such _ an increase, the FHA would have amended its commitment in the corresponding amount. However, such an increase was denied by the *354 determination of the Air Force in their letter of September 18,1958.
There is no authority which would now enable the Commissioner to increase the mortgage amount subsequent to completion and final endorsement, and there appears no disposition on the part of the Air Force to authorize an increase in the mortgage amount on the sections of this project which await final endorsement.
24. (a) The parties have agreed upon the number of hours of labor affected by this controversy as being 2,174,150.5 hours of straight time and 619,754.5 hours of overtime.
(b) Defendant concedes that if plaintiff is entitled as a matter of law to recover on the basis of a finding that there was an increase in wage rates of 8 cents per hour straight time and 12 cents per hour overtime,[62] the amount of the recovery would be $248,303.[63]
(c) Plaintiff concedes that if it is entitled as a matter of law to recover on the basis of a finding that there was an increase in wage rates of 40 cents per hour,[64] the amount of its recovery would nevertheless be limited to $876,799, because of the statutory ceiling.[65]
(d) The figures shown in paragraphs (b) and (c) of this finding are found to be the correct amounts of the recovery in the event plaintiff is deemed to be entitled as a matter of law to recover on one basis or the other.
25. At the pretrial conference[66] the parties agreed upon the following statement of the issues of fact:
1. Did plaintiff consider 60 cents per hour to be the rate of gross wages, or did it know, or should it reasonably have known, that the 60-cent rate represented cash wages exclusive of fringe benefits ?
*355 2. In either event, did plaintiff, in the preparation of its bid, rely upon the official determination of prevailing wages?
3. Did plaintiff incur additional cost as a result of the subsequent wage determination of the $1 rate?
These issues are considered in reverse order in the findings next succeeding.
26. (a) While the question as framed at the pretrial conference — whether plaintiff incurred additional cost as a result of the subsequent wage determination of the $1 rate— was not limited to the situation described in finding 22, the facts recited in that finding require initially an affirmative answer: plaintiff did incur costs as a result of the $1 wage determination in addition to the costs it would have incurred if that determination had not been made.
(b) As to whether or not plaintiff incurred costs as a result of the $1 wage determination additional in amount to or differing in nature from the foregoing, the evidence as a whole again warrants an affirmative answer.[67]
27. The evidence warrants the finding that plaintiff, in the preparation of its bid, did rely upon the official determination of prevailing wages.
Mr. Black was told by Masdelco in March (or April) 1958, while he was making his investigation on Guam, that an ample supply of Filipino labor could be recruited for employment at dollar wages on Guam, even if the net cash wage was in the 30-35 cents bracket. The information given to him by the Navy and the Air Force tended to confirm the validity of Masdelco’s judgment.
28. (a) The parties’ opening statement of the issues of fact combines three questions in one. They are considered separately in the succeeding paragraphs of this finding and in the following order:
*356 (1) Did plaintiff know that the 60-cent rate represented cash wages exclusive of fringe benefits (perquisites) ?
(2) Did plaintiff consider 60 cents per hour to be the rate of gross wages ?
(3) If plaintiff did not know, should it reasonably have known that the 60-cent rate represented cash wages exclusive of fringe benefits ?
(b) Plaintiff did not know that the 60-cent rate represented cash wages exclusive of perquisites. Wage Decision S-9589 contained no indication of this fact. Neither the Air Force nor the Department of Labor advised it of the meaning intended and implied by them. The information obtained on Guam by Mr. Black was calculated more to obscure and negate the fact than to reveal it.
(c) Plaintiff did consider 60 cents per hour to be the rate of gross wages. Acceptance of this interpretation resulted from Mr. Black’s comparison of the prevailing wage scale (60 to 68 cents per hour), read as gross wages, with comparable labor costs in Hawaii.
(d) While plaintiff did not in fact know, it reasonably should have known that the 60-cent rate represented cash wages only. The very confusion in relation to wage rates on Guam encountered by Mr. Black in the course of his investigation was enough to put him on notice to make inquiry. He did not do so prior to the submission of plaintiff’s bid.
29. Plaintiff had no reason to know that the Government interpreted Wage Decision S-9589 as setting a total minimum wage of $1-$1.08, regardless of the amount which could properly be deducted for perquisites, nor did plaintiff have reason to inquire about that subject.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, and it is therefore adjudged and ordered that plaintiff recover of and from the United States the sum of two hundred forty-eight thousand, three hundred two dollars and fifty-eight cents ($248,302.58).

The court acknowledges the significant contribution of Commissioner W. Ney Evans, whose memorandum opinion has been most useful and from whom we have borrowed. We reach the same conclusion as the Commissioner.

 ls the commissioner puts it in his finding 28(d) which we adopt: “The very confusion in relation to wage rates on Guam encountered by Mr. Black [plaintiff’s representative] in the course of his investigation was enough to put him on notice to make inquiry.”

 Finding 28(b) : “Plaintiff did not know that the 60-cent rate represented cash wages exclusive of perquisites. Wage Decision S-9589 [in February 1958J contained no indication of this fact. Neither the Air Force nor the *310 Department of Labor advised it of the meaning intended and implied by them. The information obtained on Guam by Mr. Black was calculated more to obscure and negate the fact than to reveal it.”
Finding 28(c) : “Plaintiff did consider 60 cents per hour to be the rate of gross wages. Acceptance of this interpretation resulted from Mr. Black’s comparison of the prevailing wage scale (60 to 68 cents per hour), read as gross wages, with comparable labor costs in Hawaii.”
Defendant does not except to these findings, but nevertheless appears to urge, on the basis of information acquired by Mr. Black on Guam and of the labor costs included in plaintiff’s computations preparatory to bidding, that plaintiff must have known how the Labor Department intended the wage decision to be applied. Commissioner Evans heard the testimony and weighed it carefully. We accept his conclusions. See Davis v. United States, 164 Ct. Cl. 612, 616-17 (1964); Commerce Int’l Co. v. United States, 167 Ct. Cl. 529, 537, 338 F. 2d 81, 86 (1964); Litchfield Mfg. Co. v. United States, 167 Ct. Cl. 604, 612, 338 F. 2d 94, 98 (1964); J. G. Watts Constr. Co. v. United States, ante, pp. 10-11.

 The July wage determination was in all respects identical with that of February. Vet, between February and July, the Department of Labor reconsidered the allowable cost of perquisites deductible from wages paid by Hawaiian Dredging and revised that cost downward from 40 to 32 cents.

 We assume this arguenffo; the commissioner did not so find, and plaintiff disputes it.

 See paragraph 5 of the Invitation for Bids (finding 13(c)) ; plaintiff’s wage statement in its bid (finding 15) ; and the Letter of Acceptability (finding 17(c)).

For this reason we accept the commissioner’s decision not to find these facts on which defendant relies (see finding 26(b), fn. 67), and we overrule plaintiff’s exception.

 The Fair Labor Standards Act did not apply to this project, only the Embassy Agreement. If the latter called for overtime to be calculated on the basis of the total of cash wages plus perquisites, as set forth in September, it established the same requirement with respect to the February determination.

 1. If the February determination bad remained in effect, tbe cash rate ■would have been 60 cents (to use only tbe basic wage) and the perquisites 32 cents — totaling 92 cents. If overtime is computed on this total, tbe rate would be $1.38 (1% times 92 cents). Under the September determination, tbe cash rate was 68 cents and tbe perquisites 32 cents (totaling $1). Basing overtime on this total, one obtains $1.50 (1% times $1). Tbe difference is 12 cents.
2. using only cash wages and excluding perquisites, we reach tbe same figure. Overtime on 60 cents would be 90 cents; overtime on 68 cents is $1.02. Again, the difference is 12 cents.

 Executive Order No. 10137, dated June 30, 1950, 15 F.R. 4241, amending Executive Order No. 10077, dated September 7, 1949, 14 F.R. 5523.

 Act of August 1, 1950, 64 Stat 384 ; 48 U.S.C. §§ 1421-1425. Tbe Organic Act of Guam declared tbe island to be “an unincorporated territory of tbe united States” and provided for a government consisting “of three branches, executive, legislative, and judicial * * * under tbe general administrative supervision of tbe bead of such civilian department or agency of the Government of tbe United States as tbe President may direct.”

 48 U.S.C. § 1421c.

 That is, by the express terms of the statute.

The Davis-Bacon Act (40 U.S.C. § 276a), for example, currently applies by its terms only to contracts for construction within the geographical limits of the States of the union and the District of Columbia.

 The notes were exchanged between the American Minister-Counselor and Chargé d’Affaires ad interim and the Philippine Acting Secretary of Foreign Affairs.

 At the time the Army foresaw a need for some 8,000 Filipinos for work in the Marianas-Bonins, Okinawa, and elsewhere in the Pacific.

 Specifically, Naval Supply Depot.

 There were two of these corporations, one Guamanian, the other Philippine. The contract in reference was made by the Guamanian corporation.

 For citations to legislation comprising the National Housing Act, see united States Code, 1958 edition, Popular Name Index, pp. 9332-33'.

 By the Act of July 14, 1952» 66 Stat. 603, 12 U.S.C. 1748(g).

 69 Stat. 651 (being subchapter VIII) ; 12 U.S.C. §§ 1748-17481; 42 U.S.C. §§ 1594-15945 (f).

 12 U.S.C. 1715c, initially § 212 of the National Housing Act, as added June 3, 1939, 53 Stat. 807. Administration was referred to the Secretary of Labor by Reorganization Plan No. 14 of 1950, 15 F.R. 3176, 64 Stat. 1267, 5 U.S.C. § 133z — 15 Note.

 40 U.S.C. § 276a.

 29 U.S.C. §§ 201-209.

 40 U.S.C. § 276c.

 18 U.S.C. 5 874.

 71 Stat. 614.

 29 U.S.C. §§201-209.

 The other joint venturers were J. H. Pomeroy & Co., Inc., of San Francisco, and Koster & Wythe, of Agana, Guam.

 This contract fixed Masdelco’s overhead aUowance at 33 cents per man-hour.

 Finding 7(e).

 Acting through the Chief, Housing Programs and Contracts Division, Directorate of Installations.

 This “section” is hereinafter identified as the Wage Determination Division. It was a separate entity from the Wage and Hour and Public Contracts Divisions.

 This Estimate had, in fact, been completed on January 20, 1958. A Cost Estimator for the EHA had prepared a survey of wages for the purpose. He apparently found wage rates as low as 87 cents per hour payable as recently as October 28, 1957.

 In Washington, the Department of Labor also notified some representative of the Air Force that the 60-68 cents figures represented cash wages only. He made no memorándum of this construction, and the Air Force never notified bidders of it.

 At the outset of acquiescence in this allocation, the Government agencies had required the contractor to “hold in escrow sufficient money to ensure payment to workmen of the difference required if the final value of perquisites were lowered, as far as $11.60.”

 In addition to H. E. Black, Ltd., the joint venturers included Raber-Kief, Incorporated, and B-E-C-K Constructors, another joint venture composed of Koon-Boen, Inc., Cummins-Egge, Inc., and McLaughlin, Inc. The joint venture had been formed a few months earlier to bid on a Capehart project at Kaneohe Marine Air Station, in Hawaii. The bid was made, but was not successful. The joint venturers then turned their attention to Guam as a potential area for work.

 Their bid on the Navy project was unsuccessful, but they succeeded in their bid on the Capehart project, which is the contract in suit.

 More than 1,000 Filipino workmen were then being supplied by Masdelco to the Navy for work on the Navy base.

 Mr. Black testified to having reached the conclusion that Hawaiian Dredging, being a prime competitor of 13. E. Black, Ltd., was being purposefully vague and evasive.

 The Air Force had some 1,500 Filipinos employed on Guam, and the Navy had some 3,500, who were paid cash wages in the 30-cent bracket (i.e., below 40 cents) as late as October 1960. Private contractors and businessmen on Guam were likewise paying Filipinos wage rates in the 30-cent bracket.

 He ascribed the 45 percent efficiency to common labor and the SO percent scale to the more skilled trades.

 Mr. Black adopted as his starting point a going wage rate in the Philippines of 25 cents per hour, to which he added the 25 percent overseas differential to arrive at a cash wage of 32 cents. On the basis of the 60 to 68 cents required by the wage determination, he assumed a spread of cash wages of 32 to 37.5 cents. By implication, the difference (roughly 28 cents) would represent the (deductible) cost of perquisites. The allowances made by him for other costs (recruitment, transportation, and fringe benefits including tools) when modified by efficiency factors, indicated to him a total cost of labor of approximately $1.65 per hour, which was the Hawaiian rate for comparable labor.
His testimony in support of this synthesis was rational and complete, with the exception of the omission of a firm estimate of the cost to him of providing perquisites. He must have known (1) that he, as a contractor, could not expect to match the 12.5 to 13 cents cost of the Air Force and Navy, since those agencies owned their facilities, and (2) that his cost might run as high as Hawaiian Dredging's 40 cents. The evidence, although not explicit, warrants the inference that he thought the cost of perquisites would be within the range of 28 cents.

 Invitation No. 25-600-58-14.

 Contract No. AF 64 (133) — 401.

 Mr. Black was then in Guam. He did not see the Invitation for Bids until after his return to Honolulu in April. He was, however, familiar with the general scheme of the invitation and contract by virtue of having previously bid on similar projects.

 69 Stat. 635.

 42 U.S.C. §§ 1594 — 1594j (f) ; 12 U.S.C. §§ 1748-17481.

 Anthony P. Miller, Inc. v. United States, 161 Ct. Cl. 455 (1963), cert. denied, 375 U.S. 879; and Heers v. United States, 165 Ct. Cl. 294, 357 F. 2d 344 (1964).

 Rinding 5 (b) and (c).

 By the Acting Administrator of the Wage andi Hour and Public Contracts Divisions.

 His official title was Chief, Office of Manpower Services, Department of Labor,- Republic of the Philippines. •

 Plaintiff had some intimation, of course, through its correspondence with Masdelco, of the Philippine Government’s approach to the American Government, but was not informed of the purpose or scope of it.

 There had been a postponement from the August date originally scheduled.

 Overt expression of the challenge of plaintiff's good faith occurred at a later session of the meetings between representatives of plaintiff and officials of the Air Force. When plaintiff asked for a recess in the closing conferences, in *345 order to review its legal position vis-a-vis an “increase in price” because of an increase in wage rates, the civilian bead of the Air Force group ordered the conference room cleared of all Government documents and personnel, as a preliminary to an immediate declaration of default by plaintiff of its obligations with respect to closing.

 One of the Air Force representatives observed that if the request were granted, “the contractor will certainly reap a bonanza.”

 The Department of Labor subsequently took and maintained-the position that this decision was not so much superseded as explained by the new decision.

 Specifically, the letter was addressed to Col. Robert H. Mitchell, USAF, Chief, Housing Programs & Contract Divisions, Directorate of Installations, DCS/O, Department of the Air Force, Washington.

 Specifically, to Colonel Mitchell.

 Specifically, to Mr. Richard B. Talley, Deputy Chief, Directorate of Installations, Department of the Air Force.

 Specifically, to the Director of FHA.

 The opening sentence of the contract so states, as does the concluding clause. The actual signing occurred on September 24, 1958.

 Prior to the extension of the FLSA to Guam, some contractors, including Hawaiian Dredging, had computed and paid overtime on cash wages only. If plaintiff had followed this practice, its overtime rates, even with T-5369 in force, would have been of the order of 90 cents to $1.02.

 Plaintiff makes no point of the few weeks during which the deduction was limited to $10.05 per week (25.15 cents per hour). Presumably, the amount of wages paid to Filipinos during this make-ready period was relatively small.

 Their rationalization was and is that at the time of the issuance of Decision S-9589, the going cash wage was .60 to 68 cents per hour while the deductible cost of perquisites was then established at 40 cents per hour. They considered Decision S-25,245 a reaffirmation of Decision S-9589. Plaintiff, on the other hand, emphasizes the fact that between the dates of issuance of S-9589 in February and S-25,245 in July, the Department of Labor had made several determinations of the cost of perquisites (including one for Hawaiian Dredging), all below 40 cents per hour, wherefore some change should have been reflected in S-25,245.

 The contention upon which plaintiff originally rested its ease is that the 60-68 cents scale in Decision S-9589 (repeated in Decision S-25,245,) was reasonably interpreted and applied by it as reflecting total wages, from which the reasonable cost of perquisites would be deducted.

 Plaintiff’s rationale was and is that, accepting for the purposes of discussion the Government’s assertion that the 60-68 cents represented cash wages, the total wage was not the cash wage plus 40 cents but the cash wage plus such sum as would reflect the cost of perquisites, for which it would accept the Government’s determination of reasonable cost as an adequate reflection.

 Plaintiff was bound by the Embassy Agreement to provide tbe perquisites. Although the Embassy Agreement envisioned deduction of the cost from total wages, the Department of Labor had no responsibility for the Agreement. Its responsibility, according to its own position, was limited to protecting the integrity of Davis-Bacon wage determinations.

 No hearing was held by any administrative board, nor were any facts found. While plaintiff did apply to the contracting officer for a ruling and did appeal the contracting officer’s adverse ruling to the head of the Department, the matter was handled in a series of conferences followed by decisions denying plaintiff’s claim. There has never been any issue in this case within the meaning of the factual determination provisions of the standard disputes clause.

 Mr. Tee had been in Washington for the closing conferences. When the question arose, as hereinabove outlined, as to whether or not Decision T-5389 resulted in an increase of wages over Decision S-25,245, Mr. Yee discussed the matter with his superior officers at FHA, who conferred with Mr. Beaird at the Department of Labor. The decision at FHA at that time, was to support the position of the Department of Labor and the Air Force. At the trial of the case in Honolulu, Mr. Yee (then no longer in Government employment) expressed the opinion that no increase in wage rates resulted from Decision T-5369.

 Based on the 8 cents differential between the 60-cent cash rate specified In the wage decisions and the 68-cent cash rate resulting from $1 less 32 cents for perquisites. See finding 22(g).

 This computation apparently overshoots the mark by 42 cents.

 Computation based upon the number of straight time hours multiplied by 40 cents plus the number of overtime hours at ,60 cents results In a total of $1,241,512.90, which is the amount by which plaintiff claims to have been damaged.

 The measure of damages in this case is subject to the statutory limitation of the difference between the amount plaintiff received under the contract and the statutory maximum, which was $20,250 per unit for 1,050 units, or $21,-262,500. Since plaintiff had already received $20,385,701 (finding 22(b)), the allowable adjustment is limited to the difference, viz, $876,799.

 The initial pretrial conference was held in Washington on August 6, 1963.

 Defendant contends that because plaintiff made a substantial profit (-which It did) in spite of the change in wage rates ; that because it effected economies during performance by means of intensified training of employees, the use of die or assembly tables, and some prefabrication; and because its labor costs overall were less than had been anticipated in the preparation of its bid: that therefore the contractor suffered no damage even if its rates of wages were increased. The facts upon which defendant relies to support its contention are believed to be immaterial as long as the fact is established (which it is) that plaintiff could have done the job for less money if it had not been required to pay the higher wages.